881 So.2d 976 (2003)
TYSON FOODS, INC.
v.
Martha McCOLLUM.
1020829.
Supreme Court of Alabama.
September 12, 2003.
Rehearing Denied November 21, 2003.
*978 David L. Warren, Jr., of Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Birmingham, for appellant.
Robert A. Huffaker of Rushton, Stakely, Johnston & Garrett, P.A., Montgomery; and Randy Beard and P.J. Harris of Beard & Beard, Guntersville, for appellee.
Lawrence T. King and Richard F. Horsley of Goozee, King & Horsley, LLP, Birmingham, for amici curiae Betty Williams, Donnie Forbes, Anthony Musso, and James Pierce, in support of the appellee.
HOUSTON, Justice.
Tyson Foods, Inc., appeals from the Marshall Circuit Court's judgment entered on a jury verdict against it and in favor of Martha McCollum in her action alleging retaliatory discharge under Ala.Code 1975, § 25-5-11.1, a part of the Alabama Workers' Compensation Act. Tyson contends, among other things, that the trial court erred in denying its motions for judgment as a matter of law, for a new trial, or for a remittitur. We hold that the trial court erred in denying Tyson's postjudgment motion for a judgment as a matter of law, and we reverse and remand.
Alabama recognizes and protects an employer's right to terminate an at-will employee for any reason  good or bad  or for no reason at all. Wal Mart Stores, Inc. v. Smitherman, 872 So.2d 833, 838 (Ala.2003) ("`Under Alabama law, an employment contract is generally terminable at will by either party, with or without cause or justification  for a good reason, a wrong reason, or no reason at all.'" Quoting Culbreth v. Woodham Plumbing Co., 599 So.2d 1120, 1121 (Ala.1992).). However, Ala.Code 1975, § 25-5-11.1, provides a narrow exception to that general rule, forbidding employers from terminating an at-will employee solely because that employee sought workers' compensation benefits:
"No employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits under this chapter...."
(Emphasis added.)
In this case, Tyson moved for a judgment as a matter of law at the close of the plaintiff's evidence, and again at the close of all of the evidence. The trial court denied those motions. Tyson subsequently renewed its motion for a judgment as a matter of law after the trial court entered a judgment on the jury's verdict. We review the trial court's denial of Tyson's postjudgment motion for a judgment as a *979 matter of law under the following standard:
"The standard of review applicable to a ruling on a motion for [a renewed judgment as a matter of law] is identical to the standard used by the trial court in granting or denying a motion [for a judgment as a matter of law]. Thus, in reviewing the trial court's ruling on the motion, we review the evidence in a light most favorable to the nonmovant, and we determine whether the party with the burden of proof has produced sufficient evidence to require a jury determination.
"....
"... In ruling on a motion for a [renewed judgment as a matter of law], the trial court is called upon to determine whether the evidence was sufficient to submit a question of fact to the jury; for the court to determine that it was, there must have been `substantial evidence' before the jury to create a question of fact. `[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'"
American Nat'l Fire Ins. Co. v. Hughes, 624 So.2d 1362, 1366-67 (Ala.1993) (citations omitted).
In a retaliatory-discharge action, the former employee bears the burden of establishing each element of her claim by "substantial evidence" before that claim can go to the jury. If the employee fails to do so and the employer files a motion for a judgment as a matter of law pointing out this failure before the case is submitted to the jury (as was done in this case), the trial court errs if it submits the retaliatory-discharge claim to the jury; if the jury returns a verdict for the employee on the retaliatory-discharge claim and the trial court enters a judgment on that verdict, the trial court commits reversible error, which the employer may point out by filing a postjudgment motion for a judgment as a matter of law.
The evidence, both undisputed and disputed, viewed most favorably in support of McCollum's retaliatory-discharge claim reveals that McCollum began work on July 29, 1997, at a chicken processing plant owned and operated by Hudson Foods, Inc.; that Tyson acquired Hudson Foods in January 1998; and that on July 21, 1998 (almost one year after McCollum started working for Hudson Foods and six months after Tyson acquired Hudson Foods), McCollum sustained an on-the-job injury to her finger while working a sealing machine on a bag line conveyor. It is undisputed that Tyson paid for all of the medical expenses McCollum incurred as a result of this injury and that McCollum received $3,100 in workers' compensation benefits related to this injury. There is no evidence in the record indicating that (nor is there any argument concerning whether), under the Alabama Workers' Compensation Act, this amount was excessive or inadequate for the injury McCollum suffered.
McCollum returned to work in September 1998, but, because of her injury, she was physically unable to perform her job on the bag line conveyor. Tyson placed her in a different job, allowing her to work in its laundry room where she was able to undergo physical therapy three times a day for her finger. As she felt able, McCollum would help out in the laundry room by hanging smocks worn by the employees while they worked. About a month after McCollum returned to work, a Tyson nurse told McCollum that McCollum's doctors felt that she was ready to return to regular work and asked her if she would be willing to try to do so. *980 McCollum agreed, and Tyson placed her in the marinated raw breaded ("MRB") department, where her job was to check chicken that had been processed into "fingers" on a conveyor belt. The temperature of the work environment for this position was cold.[1]
McCollum remained in this job for only three or four days, because the work, where the chicken products were conveyed on the belt at a fast speed, made her dizzy.[2] McCollum informed Jerry Phillips, Tyson's human resources manager, that she could not perform the work because it made her dizzy. McCollum testified that Phillips told her that Tyson did not have any other type of work that McCollum could perform, so Phillips suspended McCollum without pay for three days.[3] McCollum also testified that she was asked to present a doctor's excuse, and that she later presented one stating that she could not work on fast-moving production lines involving small products.[4] McCollum also testified that three days after her meeting with Phillips, Tyson's nurse told her that Phillips did not understand the situation and to come back to work on Monday. After McCollum presented the doctor's excuse, Tyson placed her in the position McCollum had requested  a checker on the bag line in the MRB department. McCollum did not suffer from dizziness on this line because the bags on the line were large. Her duties in this new position involved checking to make sure that the bags were correctly sealed and coded, and, like her prior position, it was in a cold-work environment. Twelve other employees worked on this line with McCollum. McCollum testified that up until her assignment as a checker on the MRB line, no one at Tyson had harassed or mistreated her in any way.
After working on the MRB line for a time, McCollum decided to try a job in the debone department.[5] She tried the job but did not like it because she could not operate the machine well with one hand and because it was colder in the debone department than it was in the MRB department. She requested to be, and was, returned to her job in the MRB department.[6]
McCollum testified that on March 10, 2000 (approximately 18 months after she had returned to work following the injury for which she received workers' compensation benefits and approximately 20 months after she had filed her claim for those benefits), while working on the evening shift, she became sick; she was sneezing and coughing, and she had a temperature. The illness had nothing to do with the 1998 injury to her hand for which she had received *981 workers' compensation benefits. McCollum went to the clinic at the plant and saw the nurse. After she saw the nurse, McCollum told her supervisor, Joe Carroll, that she was ill and needed to go home. Carroll told her that he needed to get David Smith, a processing superintendent, but before going to get Smith, Carroll moved McCollum down the line away from any blowing air. McCollum moved, but told Carroll that moving away from the blowing air would not help because she was already sick.
Carroll left to find Smith, and Smith then came up and stood next to McCollum on the line. The conversation between McCollum and Smith and the circumstances surrounding that conversation are the focus of much of the dispute in this case. However, under our standard of review, McCollum's version of the conversation, as stated below, controls.
McCollum testified that she told Smith that she was ill, advised him that she had seen the plant nurse, and informed him that she needed to go home.[7] Smith would not authorize her leaving and told her that if she left, it would be an unauthorized leave. McCollum replied: "Do you mean I'm fired?" Smith answered: "Yes, you will lose your job if you leave." At this point, the power in the entire plant went off as the result of a thunderstorm, and Smith left McCollum. Smith testified that before leaving McCollum to go check on the power outage, Smith told her, "Wait just a minute." However, McCollum did not wait; rather, she told Carroll what Smith had said and advised him that she was sick and was going home. Carroll replied "okay,"[8] and McCollum left.[9]
When Smith returned 25 to 30 minutes later after checking on the power outage, he learned that McCollum had left. Smith then filled out a separation notification form, which stated that McCollum had "walked off the job." He checked the block indicating that she was "not eligible for rehire," and he described the circumstances on this form as follows: "Martha [McCollum] walked off of her job and left." It is undisputed that Smith was aware that McCollum had previously sustained an injury at work, but he claimed that he was unaware that she had instituted or maintained an action or had even filed a claim for workers' compensation benefits.
McCollum testified that she returned to Tyson on March 17, 2000, to pick up her paycheck. A Tyson employee presented her with an exit-interview form and instructed her to fill it out to indicate that she had quit her employment. She adamantly refused to sign this statement because she claimed that she had not quit, but that she had been fired.
She was then asked to complete the form by stating the reason for the cessation of her employment. She wrote on the form that she was fired for asking to leave work because she was sick. On the form, she rated her department as "fair" and her supervisor as "poor." She presented the form to Cindy Light, an assistant personnel manager,[10] and Light stated that *982 "there's something wrong" and she requested that McCollum wait a few minutes while Light spoke with Jerry Phillips, Tyson's human resources manager. McCollum then met with Phillips and Jeanette Masters, a union representative who happened to be in the plant at the time. Phillips inquired about the circumstances leading to the termination of McCollum's employment. She explained the circumstances to him, and Phillips stated that Smith, McCollum's supervisor, did not have the authority to fire McCollum, that he should not have terminated her, and that terminating her was the wrong thing to do. McCollum replied that she did not want to work at Tyson because she was frightened of the harassment she claimed to have experienced while she was employed at Tyson.[11]
Phillips asked her to return to work, requesting that she take a few days to think about it and that she then advise him of her decision. She telephoned several days later to advise him that she would not return because she was afraid to do so.
As stated above, a retaliatory-discharge claim under Ala.Code 1975, § 25-5-11.1, requires evidence that the plaintiff was terminated solely because the plaintiff had instituted or maintained an action against the employer to obtain workers' compensation benefits. While this Court has recognized that Ala.Code 1975, § 25-5-11.1, is remedial legislation and, thus, that it should be construed liberally, it also has cautioned that courts must "refrain from construing § 25-5-11.1 in a manner that revises the at-will doctrine beyond the extent necessary to accommodate the obvious legislative purpose." Alabama Power Co. v. Aldridge, 854 So.2d 554, 562 (Ala.2002).
As used in § 25-5-11.1, the adverb "solely" modifies the verb "terminated." The American Heritage Dictionary of the English Language (4th ed.2000), defines the adverb "solely" as "[a]lone; singly: solely responsible. Entirely; exclusively."[12] To "institute" is "[t]o inaugurate or commence, as to institute an action." Black's Law Dictionary 800 (6th ed.1990). "To `maintain' an action is to uphold, continue on foot, and keep from collapse a suit already began, or to prosecute a suit with effect.... To maintain an action or suit may mean to commence or institute it.... Maintain, however, is usually applied to actions already brought, but not yet reduced to judgment.... In this connection it means to continue or preserve in or with; to carry on." Black's Law Dictionary 953 (6th ed.1990). "Action" in its legal sense "means a lawsuit brought in a court; a formal complaint within the jurisdiction of a court of law." Black's Law Dictionary 28 (6th ed.1990).
In this case, it is undisputed that McCollum did not file or maintain any "action" for workers' compensation benefits as the term "action" is defined above. However, in McClain v. Birmingham Coca-Cola Bottling Co., 578 So.2d 1299 (Ala.1991), we interpreted § 25-5-11.1 as covering even the filing of a claim for workers' compensation benefits. Tyson does not ask us to revisit that holding.
*983 The narrow language in § 25-5-11.1 makes it clear that a cause of action brought under that section cannot be based merely on facts that show that the plaintiff was terminated at some point after that plaintiff had filed a claim for or received workers' compensation benefits. See Hayden v. Bruno's, Inc., 588 So.2d 874, 876 (Ala.1991) (refusing to assume that a termination was retaliatory merely because it followed the filing of a claim for workers' compensation benefits). Instead, § 25-5-11.1 demands that there be specific knowledge of the plaintiff's claim for benefits on the part of the one who terminated the plaintiff, and that that knowledge be the sole motivating force behind the termination. There is no room in the statute for a generalized "imputation" of such knowledge throughout a company or other entity; rather, in order to establish a prima facie case, the plaintiff must demonstrate, by substantial evidence, a direct and distinct causal link between one having knowledge of the plaintiff's workers' compensation claim and the termination. See Aldridge, 854 So.2d at 563 ("A plaintiff must prove a causal connection between the workers' compensation claim and the subsequent discharge in order to establish a prima facie case.").[13]
In this case, many facts are in dispute. However, some of the facts relevant and essential to establishing a prima facie case are undisputed and are fatal to McCollum's cause of action. According to McCollum's account of what happened on March 10, 2000, McCollum was terminated on that date by David Smith. Smith had no knowledge of McCollum's workers' compensation claim, which was concluded some 20 months before the date of her termination. There is no substantial evidence indicating that Smith's termination of McCollum had anything to do with McCollum's having received workers' compensation benefits from Tyson.[14] While Smith may have had knowledge of McCollum's on-the-job injury, it is neither necessary nor prudent, on that basis alone, to impute to Smith knowledge of McCollum's filing of a workers' compensation claim.
While McCollum's retaliatory-discharge claim is clearly directed at her allegation that Smith fired her in retaliation for her having filed a workers' compensation claim, much of the evidence put on by McCollum at trial wavers, in an obfuscatory manner, between that allegation and a general assertion that she was "constructively discharged." A "constructive discharge" occurs when "`the employer deliberately makes an employee's *984 working conditions so intolerable that the employee is forced into an involuntary resignation.'" Irons v. Service Merchandise Co., Inc., 611 So.2d 294, 295 (Ala.1992) (quoting Jurgens v. EEOC, 903 F.2d 386, 390 (5th Cir.1990)). A retaliatory-discharge claim under Ala.Code 1975, § 25-5-11.1, can certainly be based upon a constructive discharge. See Ex parte Breitsprecher, 772 So.2d 1125 (Ala.2000). However, at the trial of this case, McCollum was adamant that Smith fired her on March 10, 2000. Rather than basing her retaliatory-discharge claim on any alleged constructive discharge, McCollum appears to have offered evidence of alleged poor working conditions and harassment by co-employees[15] to imply some general pattern *985 of poor treatment by Tyson of workers who had filed claims for workers' compensation benefits.[16] Of course, this implication was hotly disputed by Tyson. However, the difficulty is that most of this evidence was not relevant, because, according to McCollum, she did not leave her job under duress. Instead, according to McCollum's own testimony, Smith  not Tyson in general  fired her, and there is no evidence indicating that Smith had knowledge of her workers' compensation claim.
Simply put, even when viewed in the light most favorable to McCollum, there is no substantial evidence of a direct and distinct causal link between one having knowledge of the plaintiff's workers' compensation claim and the termination.[17] Therefore, McCollum failed to establish a prima facie case of retaliatory discharge under Ala.Code 1975, § 25-5-11.1, and the trial court erred in denying Tyson's postjudgment motion for a judgment as a matter of law.
REVERSED AND REMANDED.
SEE, BROWN, HARWOOD, and STUART, JJ., concur.
LYONS, JOHNSTONE, and WOODALL, JJ., dissent.
JOHNSTONE, Justice (dissenting).
Our case of Alabama Power Co. v. Aldridge, 854 So.2d 554 (Ala.2002), identifies some of the circumstances that tend to prove that a plaintiff "was fired solely because of his [or her] workers' compensation claim," 854 So.2d at 564:
"`Proximity in time between the claim and the firing is a typical beginning-point, coupled with evidence of satisfactory work performance and supervisory evaluations. Any evidence of an actual pattern of retaliatory conduct is, of course, very persuasive.' ...
"....
"Texas considers the following factors as circumstantial evidence of a causal relation between the filing of a workers' compensation claim and an employee's discharge:
"`1) knowledge of the compensation claim by those making the decision on termination, 2) expression of a negative attitude toward the employee's injured condition, 3) failure to adhere to established company policy, 4) discriminatory treatment in comparison to similarly situated employees, 5) sudden changes in an employee's work *986 performance evaluations following a workers' compensation claim, and 6) evidence that the stated reason for the discharge was false.'"
854 So.2d at 564-65. While the Texas statute may not require that the filing of the workers' compensation claim be the sole proximate cause of the termination, the "but-for" test of the Texas statute, Aldridge, 854 So.2d at 564, does require that the filing be at least one of the proximate causes of the termination. Thus, Texas law for proving this particular proximate cause is appropriately adopted by Alabama for the same purpose.
In the case now before us, the evidence is undisputed that the plaintiff McCollum lost part of a finger in an on-the-job accident while she was employed by Tyson, that she filed a workers' compensation claim for the injury, and that Tyson paid workers' compensation to her pursuant to the claim. The record contains substantial evidence that Tyson treated the plaintiff well before her on-the-job injury and oppressively after her return to work following her injury and her workers' compensation claim. The record also contains substantial evidence that Tyson did not treat employees who had not suffered injuries and filed workers' compensation claims as badly.
The record contains substantial, albeit disputed, evidence that, one day some 20 months after the plaintiff filed her workers' compensation claim, David Smith, acting within line and scope of his employment with Tyson as its processing superintendent, terminated the plaintiff's employment with Tyson on the ground that she went home early because she was sick.[18] The record contains substantial evidence that such a termination violated company policy and that Tyson did not terminate other employees on the same ground.
The claim by Tyson that the plaintiff's employment ended solely because she voluntarily quit is disputed by the plaintiff's substantial evidence to the contrary. Tyson offers no other cause or reason for the termination.
Tyson admits that, at the time the plaintiff's employment ended, David Smith knew she had suffered the on-the-job injury. Because factory workers who are injured on the job rarely do not claim workers' compensation, Smith's position as processing superintendent with authority to terminate employees, together with his knowledge of the plaintiff's on-the-job injury, supports a reasonable inference that Smith knew or deduced that the plaintiff had filed a workers' compensation claim.
All of this evidence constitutes a prima facie case that Tyson, in contravention of § 25-5-11.1, Ala.Code 1975, terminated the plaintiff solely because she had claimed workers' compensation. Alabama Power Co. v. Aldridge, supra. Thus, I respectfully dissent from the conclusion, and from the rationale for the conclusion, that the plaintiff "McCollum failed to establish a prima facie case of retaliatory discharge under ... § 25-5-11.1, [Ala.Code 1975,] and the trial court erred in denying Tyson's postjudgment motion for a judgment as a matter of law." 881 So.2d at 985.
LYONS, J., concurs.
NOTES
[1] The temperature of the work environment for the job McCollum performed before her injury had also been cold. Federal regulations required Tyson to keep the temperature below 50 degrees to prevent bacteria growth on the chicken products.
[2] Dizziness associated with working that conveyor belt was apparently common, because co-employees working on that line told McCollum that she would know in three or four days whether she could tolerate the speed of the line.
[3] Phillips contended that sending McCollum home without pay was not a disciplinary action or a suspension but was done out of concern for her safety because he feared that she might get hurt.
[4] Phillips stated that the doctor's excuse was insufficient and that he needed further clarification that she could not work on the line because of "persistent vertigo."
[5] As a union member, McCollum could bid upon other open positions.
[6] It is apparently undisputed that while she worked in the debone department she experienced no workplace harassment.
[7] This was the first time during her employment that she had gotten sick at work and had asked to leave early.
[8] Additionally, McCollum testified that there were ample workers available to fill in for her that night because it was a slow production night.
[9] McCollum did not report to work on her next scheduled workday, and she did not contact anyone at Tyson between March 10 and 16, 2000.
[10] Apparently, Light finalized McCollum's separation from Tyson. On March 15, 2000, McCollum's separation notification form crossed Light's desk and she signed off on the form. Light processed this form as a "walked off the job" situation, and there is no evidence indicating that when she processed it she was aware that McCollum had previously filed a claim for workers' compensation benefits.
[11] See note 15, discussing McCollum's evidence of harassment by co-employees.
[12] A definition for the adverb "solely" does not appear in Black's Law Dictionary; however, the following definition for the noun "sole" appears: "[s]ingle; individual; separate.... Without another or others." Black's Law Dictionary 1391-92 (6th ed.1990).
[13] The first step in maintaining a cause of action for retaliatory discharge is the establishment of a prima facie case:

"We hold that an employee may establish a prima facie case of retaliatory discharge by proving that he was `terminated' because he sought to recover worker's compensation benefits, which would be an impermissible reason. The burden would then shift to the defendant employer to come forward with evidence that the employee was terminated for a legitimate reason, whereupon the plaintiff must prove that the reason was not true but a pretext for an otherwise impermissible termination."
Twilley v. Daubert Coated Prods., Inc., 536 So.2d 1364, 1369 (Ala.1988).
[14] There is evidence indicating that Smith's termination of McCollum was not in accordance with Tyson's policy for terminating employees. However, even if Smith's alleged reason for terminating McCollum was a bad reason, or if Smith had no reason, that fact would not make the termination actionable as retaliatory. As stated above, an employer can discharge an at-will employee for a bad reason or no reason, and the employee has no right to recover damages for wrongful discharge, unless the Legislature has created such a right. See Smitherman, 872 So.2d at 838.
[15] McCollum offered evidence of harassment by Antonio Ramos, a co-employee. Most of this evidence is undisputed. As a checker on the MRB line, McCollum was required to throw unsealed or improperly coded bags of chicken off the line into a large stainless steel tub. A "floor" person, Ramos would come by as part of his duties and check the bags in the tub and determine whether they needed to go back on the line or be reworked.

McCollum testified that Ramos did certain things to harass and scare her. She testified that he would pick up the stainless steel tub and then drop it, which made a loud noise she could hear through her earmuffs and that scared her and other employees. She also testified that Ramos would throw the bags back up on the line and the bags would hit her hands. McCollum testified that one day, Ramos twice fashioned soft chicken into the shape of a penis and put it in a bag on the line. McCollum also testified that when Ramos helped run boxes of chicken patties on the line, he would sling his boxes so that it would knock other boxes into a bunch causing spills.
McCollum complained to a supervisor about Ramos's slinging the boxes and picking up and dropping the stainless steel tub and she explained that after that Ramos's harassing behavior would stop for a while. McCollum saw her supervisor shaking his head at Ramos after she complained about his conduct. Ramos played around with all of his co-employees, but his supervisor, Joe Carroll, told him at one point to stop playing around with McCollum because it bothered her. While Ramos claimed that he stopped this behavior toward McCollum after receiving the warning from Carroll, McCollum testified that the conduct continued. However, there was no direct evidence indicating that any Tyson employee instructed Ramos to harass McCollum in any way.
McCollum also testified that she complained about the cold working conditions. Although McCollum was aware that the plant was cold and she had previously worked in the facility without complaining of the cold conditions, she testified that she was placed in a location where a freezer vent blew straight down on her. She testified that she observed that on other shifts, persons working in the same position as she did were not subjected to the cold blowing air.
McCollum testified that she complained to her supervisor about the cold air blowing on her. The supervisor informed her that he would talk to the maintenance man about this condition. This did result in the cold-air condition being alleviated some but a couple of days later the cold air was again blowing on her. According to McCollum, Tyson's supervisor admitted to one of the plant's union representatives that the air vent could be adjusted so that it would not blow on McCollum and he promised that this change would be made, but the condition was never permanently remedied.
McCollum also testified that, in order to try to warm herself because of the cold air directed on her, she went into the fryer room, which was a room where product was cooked and where the temperature was thus warmer. One of the supervisors barred her from going into the fryer room. She testified that other employees were permitted to go into the fryer room to warm themselves even after she had been barred from the room. She felt that she was being harassed by being denied access to this room while other employees were allowed to use it.
In 1999, Tyson put up posters that provided a toll-free number for reporting any complaints of harassment. McCollum never telephoned the toll-free number to report any harassment. She testified that she did not use the toll-free number because co-employees told her if she reported harassment, she would be harassed even more. However, McCollum did offer evidence indicating that she frequently complained to "everybody" about Ramos and the working conditions.
Of course, Tyson offered evidence to counter McCollum's assertions that she was being singled out for unfair treatment. However, as explained in this opinion, McCollum's evidence of co-employee harassment and poor working conditions, even if believed, do not support her claim that she was fired by Smith solely in retaliation for her filing a workers' compensation claim.
[16] Some of this evidence was offered through former Tyson employees who served as "pattern and practice" witnesses. Tyson contends that facts surrounding the termination or resignations of those witnesses were not "substantially similar," and that the admission of this prejudicial evidence entitles Tyson to a new trial. However, our resolution of this case precludes the need to address this issue.
[17] Although not essential to our holding, we note that the time frame in this case weighs heavily against McCollum's establishment of a causal link between her workers' compensation claim and her alleged termination. She had worked only approximately one year before her claim, and her alleged termination occurred approximately 20 months after her claim was filed. See Aldridge, 854 So.2d at 563 (finding no "temporal proximity" where the discharge occurred approximately two years after the workers' compensation claim had been filed).
[18] The plaintiff's proof of this essential element of her claim under § 25-5-11.1, Ala.Code 1975, is not eliminated by the evidence that Tyson, through its employee Jerry Phillips, tried to rehire the plaintiff after her termination.