885 So.2d 125 (2003)
COCA-COLA BOTTLING CO. CONSOLIDATED
v.
Louis Frank HOLLANDER.
1020520.
Supreme Court of Alabama.
October 31, 2003.
Opinion Overruling Rehearing January 30, 2004.
*126 Nickolas J. Steles of Ashe, Tanner & Wright, P.C., Tuscumbia, for appellant.
Michael L. Weathers, Florence, for appellee.
PER CURIAM.
Louis Frank Hollander sued Coca-Cola Bottling Co. Consolidated ("CCBCC"), alleging retaliatory discharge in violation of Ala.Code 1975, § 25-5-11.1.[1] CCBCC filed motions for a judgment as a matter of law ("JML") at the close of Hollander's evidence and again at the close of all the evidence. The trial court denied the motions. The jury returned a verdict in favor of Hollander, awarding compensatory damages of $150,000 and punitive damages of $250,000. After the trial court entered a judgment on that verdict, CCBCC filed a postverdict motion for a JML and a motion for a new trial or, in the alternative, a remittitur. The trial court denied those motions, and CCBCC appeals, contending that the trial court erred in denying the postjudgment motions. We reverse and remand.

Facts
Hollander was employed by CCBCC at its facility in Florence, Alabama, to deliver soft-drink vending machines and coolers. He was injured on Friday, August 27, 1999, when a fully loaded soft-drink vending machine, weighing between 700 and 1,000 pounds, fell on him while he and another worker were moving it into an elementary school in Collinwood, Tennessee. Hollander's legs were pinned for between 5 to 10 minutes, and it took 8 to 11 people to lift the machine off Hollander.
On the day of the incident, Hollander reported this incident to his supervisor, William Talley. According to CCBCC, Talley asked Hollander if he had been injured when the machine fell on him and if he needed medical care, and Hollander said that he had suffered a cut on his leg but that he did not require medical treatment. Hollander says that Talley did not *127 ask him if he needed to see a doctor and that he waited for guidance from Talley instead of asking to see a doctor. CCBCC's employee handbook requires that all injuries, "no matter how minor," be reported immediately to the injured employee's supervisor, "who will take whatever actions necessary to insure required medical treatment is authorized and attained and that the First Report of Injury is completed. The Employee will be referred to a doctor of CCBCC's choice." It is undisputed that Hollander complied with that policy.
Talley reported the accident to CCBCC's third-party accident claims administrator. The administrator completed a "first report of injury" form. In accordance with CCBCC's standard procedure, Talley also completed a supervisor's accident report. Hollander and his coworker continued to deliver and retrieve vending machines on the day Hollander was injured. Hollander claims that he could not drive the delivery truck after the machine fell on him on August 27 because of the condition of his legs and that his coworker, who did not have a commercial driver's license, drove the truck the rest of the day. However, Hollander's coworker testified that he did not drive the truck. After arriving at CCBCC's facility in Tennessee at approximately 5:00 p.m., Hollander and his coworker began using a forklift to load machines onto the truck for delivery the next day. As Hollander was driving the forklift to load a machine, the machine fell off the forklift.
On Monday August 30, Hollander visited Dr. Glen Sockwell complaining of stress and shortness of breath. On August 31, Hollander left Talley's office, stating, "I can't do this." On that same day Hollander visited Dr. Sockwell again. Dr. Sockwell's office notes from August 30 and 31 mention nothing about an injury to Hollander's legs or his August 27 injury. Also, on August 31 Dr. Sockwell gave Hollander a work-release slip excusing him from work for the period August 31 through September 12.
On September 1, 1999, Hollander visited the North Alabama Bone and Joint Clinic, a group of physicians approved by CCBCC to treat work-related injuries of its employees. Hollander saw Dr. Lee Nichols, one of the physicians at the clinic, and complained of pain in his right knee and left ankle as a result of the August 27 incident. Dr. Nichols did not consider it necessary to excuse Hollander from work because of the injury to his legs. Hollander has not made any claim based on the injuries he suffered as a result of the August 27 incident other than a claim for the medical expenses incurred in his September 1 visit to Dr. Nichols.
On September 7, Joe Clayton, general manager of CCBCC's Florence facility, learned for the first time that Hollander was seeking workers' compensation benefits for a heart condition and stress, for which Dr. Sockwell treated him on August 30 and 31. Clayton informed the claims administrator of Hollander's claim and completed a first report of injury form related to Hollander's heart condition and stress-related complaint. Robyn Masoner, a benefits coordinator with CCBCC, forwarded Dr. Sockwell's work-release slip to Lou Jane Miller, CCBCC's environmental safety manager at its offices in Brentwood, Tennessee, who was responsible for deciding whether an employee's claim was compensable. Miller told Masoner that CCBCC did not consider Hollander's heart condition and stress claim to be based on a compensable injury.
On September 8, Hollander returned to Dr. Sockwell's office; he denies that he returned to Dr. Nichols's office on that date. Dr. Nichols reported in his notes *128 that he saw Hollander on September 8, but he admits that those notes are incorrect and that he actually had a telephone conversation with Hollander on that date. Dr. Nichols testified that in that telephone conversation Hollander asked him to
"write a work release or an excuse from work from the date of his [August 27] injury, because he said that when he presented the work release Dr. Sockwell gave him, his employer would not accept Dr. Sockwell's work release because he was not their company doctor."
Dr. Nichols admitted that his notes were in error in stating that he saw Hollander on September 8; he testified, however, that he could not have been mistaken as to Hollander's asking him to backdate a work-release slip for him. As part of the regular claims procedure, Dr. Nichols's office faxed the medical record notes of September 1, 1999, and September 8, 1999, to Miller at CCBCC's offices in Brentwood, Tennessee. On September 13, 1999, Miller faxed the notes to Clayton at CCBCC's Florence facility, and he determined that, in asking Dr. Nichols to backdate a work-release slip, Hollander had been dishonest.
Before the conversation with Dr. Nichols related above, Hollander had made numerous telephone calls to Masoner and Miller inquiring about his workers' compensation claim. Masoner told Hollander that he was not eligible for short-term disability to cover his time off work after September 1, and Hollander had already used all of his vacation time. According to Masoner's testimony, at some point after learning the above, Hollander asked:
"What if I call my Worker's Comp doctor [Dr. Nichols] back, the original doctor back that I went to for my Worker's Comp injury, and get them to say that the reason I was off was due to the Worker's Comp [August 27] injury?"
Masoner's answer was that Hollander could not do that and that such an action "would be dishonest, and it would be a falsification." Hollander denies that he told Masoner what she claims he did. After the telephone call with Hollander in which she says he inquired about talking to Dr. Nichols, Masoner telephoned Miller and told her about the conversation. It is at this point that Hollander allegedly telephoned Dr. Nichols to tell him that his employer would not accept Dr. Sockwell's work-release slip because Dr. Sockwell was not a doctor approved by CCBCC and to ask Dr. Nichols to backdate a work-release slip so that Hollander could be paid for his time off. Dr. Nichols informed him that he would not backdate a work-release slip, and that, in any event, in his opinion Hollander could perform his work without any restrictions.
On September 13, 1999, Hollander returned to work. On September 14, Talley and Clayton[2] informed Hollander that he was being terminated from his job for attempting to have Dr. Nichols backdate a work-release slip. Talley also showed Hollander Dr. Nichols's notes and gave him a corrective action form, dated September 14, 1999. Hollander told Talley that he never asked Dr. Nichols to backdate a work-release slip and he refused to sign the corrective action form but instead wrote the following and initialed the form:
"Would like to talk to Dr. Nichols before I sign anything. F.H."
Clayton testified that the sole reason Hollander's employment was terminated was for dishonesty, based on Dr. Nichols's notes indicating that Hollander had attempted to get Dr. Nichols to backdate a work-release slip. Hollander himself testified *129 that because of the nature of his job  carrying large amounts of cash for use in the vending machines  dishonesty was a legitimate reason for CCBCC to terminate his employment. Talley completed an employee-separation form, which had specific codes for the reasons for terminating an employee. Talley chose 12D as the reason Hollander was terminated, the only category close in class to the offense Hollander was suspected of. It stated: "Termination  Falsifying Company Documents."
Hollander saw two counselors after his employment was terminated to help him with his anguish about being terminated and with other problems. Hollander testified that he had lost income of $30,000 as a result of the termination and that he had used his own funds to pay to go to school to become a long-distance truck driver.
Hollander alleges that discrepancies exist between Talley's reports and Talley's deposition testimony and his trial testimony. In the August 27, 1999, first report of injury form, Talley reported that Hollander and another employee had lost control of the machine, dropping it on Hollander's legs, and that as a result one of Hollander's legs had been cut. Neither that report nor the supervisor's accident report, also completed by Talley, mentioned that Hollander had been pinned under the machine. During Talley's September 17, 2002, deposition, he stated that Hollander had reported that "a machine had fell on [him] and pinned him and hurt his legs." Yet at trial in October 2002, Talley testified that Hollander did not tell him that he was pinned when the machine fell on him.
There were problems with other reports. Talley's supervisor, Clayton, prepared a report that stated that Hollander was injured on August 30. Hollander did not work on August 30, which was a Monday. On Tuesday August 31, Hollander's next scheduled work day, Talley met with Hollander twice and with Hollander's coworker once to obtain further details of the August 27 incident. Talley claims that after Hollander learned that he had received two safety "corrective actions" for August 27  one for the incident at the Collinwood elementary school and one for dropping a vending machine off the forklift  Hollander left the premises saying, "I can't handle this." The first incident required a corrective action because the coworker and Hollander were attempting to move a fully loaded machine when the incident occurred. CCBCC says that its rules prohibit moving a fully loaded machine. Hollander claimed that the rules regarding moving fully loaded machines were not properly enforced or well communicated. The second incident required a corrective action because Hollander did not know where his coworker was when he was moving the machine that fell off the truck.

Standard of Review
Alabama recognizes and protects an employer's right to terminate an at-will employee for any reason  good or bad  or for no reason at all. Wal-Mart Stores, Inc. v. Smitherman, 872 So.2d 833, 838 (Ala.2003) ("`Under Alabama law, an employment contract is generally terminable at will by either party, with or without cause or justification  for a good reason, a wrong reason, or no reason at all.'" (quoting Culbreth v. Woodham Plumbing Co., 599 So.2d 1120, 1121 (Ala.1992))). However, Ala.Code 1975, § 25-5-11.1, provides a narrow exception to that general rule, forbidding employers from terminating an at-will employee solely because that employee sought workers' compensation benefits:
"No employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover *130 workers' compensation benefits under this chapter...."
(Emphasis added.)
We review the trial court's denial of CCBCC's post-verdict motion for a JML under the following standard:
"The standard of review applicable to a ruling on a [postverdict] motion for [a JML] is identical to the standard used by the trial court in granting or denying [a preverdict] motion [for a JML]. Thus, in reviewing the trial court's ruling on the motion, we review the evidence in a light most favorable to the nonmovant, and we determine whether the party with the burden of proof has produced sufficient evidence to require a jury determination.
"....
"... In ruling on a motion for a [JML], the trial court is called upon to determine whether the evidence was sufficient to submit a question of fact to the jury; for the court to determine that it was, there must have been `substantial evidence' before the jury to create a question of fact. `[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'"
American Nat'l Fire Ins. Co. v. Hughes, 624 So.2d 1362, 1366-67 (Ala.1993).
The narrow language in § 25-5-11.1 makes it clear that a cause of action under that section cannot be based merely on facts that show that the plaintiff was terminated at some point after that plaintiff had sought or received workers' compensation benefits. See Hayden v. Bruno's, Inc., 588 So.2d 874, 876 (Ala.1991) (refusing to assume that an employee's termination was retaliatory merely because it followed a claim for workers' compensation benefits). Instead, § 25-5-11.1 requires that knowledge of the employee's filing of a workers' compensation claim be the sole motivating force behind the termination of employment. In order to establish a prima facie case, the plaintiff must demonstrate, by substantial evidence, a direct and distinct causal link between one having knowledge of the plaintiff's workers' compensation claim and the termination. See Alabama Power Co. v. Aldridge, 854 So.2d 554, 563 (Ala.2002) ("A plaintiff must prove a causal connection between the workers' compensation claim and the subsequent discharge in order to establish a prima facie case.").
The first step in maintaining a cause of action for retaliatory discharge is to establish a prima facie case:
"We hold that an employee may establish a prima facie case of retaliatory discharge by proving that he was `terminated' because he sought to recover worker's compensation benefits, which would be an impermissible reason. The burden would then shift to the defendant employer to come forward with evidence that the employee was terminated for a legitimate reason, whereupon the plaintiff must prove that the reason was not true but a pretext for an otherwise impermissible termination."
Twilley v. Daubert Coated Prods., Inc., 536 So.2d 1364, 1369 (Ala.1988).
As we review the evidence in the record, we indulge "all reasonable inferences that can be drawn from the facts as viewed in the light most favorable to" Hollander. L & L Servs., Inc. v. Com-Pak Food Marts of Florence, Inc., 575 So.2d 1094, 1095 (Ala.1991). Even so, Hollander's prima facie case is weak. His only evidence is circumstantial. His argument is that because he had received satisfactory work evaluations and because his termination occurred close in time to his filing *131 of a workers' compensation claim, CCBCC must have terminated his employment because he filed a workers' compensation claim. However, mere closeness in time typically is not sufficient evidence of a retaliatory discharge. Hayden v. Bruno's, Inc., 588 So.2d 874, 876 (Ala.1991) (court refused "to assume that, because he was terminated after he had filed [a] claim, the termination was retaliatory"). Close temporal proximity between the claim and the termination must be so coincidental as to raise an inference that the claim caused the termination. See Rickard v. Shoals Distrib., Inc., 645 So.2d 1378 (Ala.1994); Overton v. Amerex Corp., 642 So.2d 450 (Ala.1994); Graham v. Shoals Distrib., Inc., 630 So.2d 417, 418 (Ala.1993); Culbreth v. Woodham Plumbing Co., supra. The alleged dishonesty occurred in conjunction with the claims process itself; therefore, it was not coincidental that CCBCC terminated Hollander's employment close in time to his filing of a workers' compensation claim.
Also, the satisfactory evaluations of his job performance are irrelevant to his claim because dishonesty, not poor job performance, was the basis CCBCC relied upon for terminating Hollander's employment. Ex parte Usrey, 777 So.2d 66, 68 n. 1 (Ala.2000) (evidence of employee's 30-day suspension for testing positive for drug use was irrelevant because employer "did not rely on the drug suspension as providing a permissible reason" for terminating employment). Actually, Hollander presented no evidence showing a causal connection between the filing of his claim for workers' compensation benefits and his termination.
As this Court stated in Alabama Power Co. v. Aldridge, supra: "[I]f there is uncontradicted evidence of an independently sufficient basis for the discharge then the defendant is entitled to a judgment as a matter of law." 854 So.2d at 568. That "independently sufficient basis" need not be the sole basis. It must simply be a legitimate basis for the termination. In Aldridge, the employee obtained a $500,000 judgment based on a retaliatory-discharge claim. The employee had left a message with his employer that he would not be at work because he needed to repair his roof, which, he said, had suffered some storm damage. Instead, the employee purportedly spent the day waiting for an insurance adjustor to assess the damage to his roof.[3] The employee made an argument similar to the one Hollander makes here, and the employee presented evidence indicating that he had, in fact, made no misrepresentation. This Court reversed the trial court's judgment because there was undisputed evidence that a legitimate reason existed for the discharge; therefore, Aldridge had failed to meet the proof necessary that, as required by § 25-5-11.1, he was fired solely because he had filed a workers' compensation claim.
Even if we were to assume that Hollander had made a prima facie case against CCBCC, Hollander's claim fails. Once Hollander presented a prima facie case that his employment was terminated because he had filed a workers' compensation claim, CCBCC was entitled to present evidence indicating that there was another reason for his termination, which it did by presenting evidence indicating that it terminated Hollander for dishonesty.[4]
*132 Hollander claims that CCBCC and others involved in the claims process falsified records to cause him to be terminated and that CCBCC should have investigated the matter after Hollander denied that he had asked Dr. Nichols to backdate a work-release slip. The fact that CCBCC did not conduct such an investigation, Hollander argues, proves that dishonesty was a pretext for terminating his employment because he filed a workers' compensation claim. Even if Hollander could prove that several individuals purposely falsified records[5] and that Hollander did not ask Dr. Nichols to falsify a work-release slip for him, that would not prove that CCBCC used dishonesty as a reason for Hollander's termination merely as a pretext for terminating him because he had filed a workers' compensation claim.
Even if we assume that CCBCC believed Hollander to be innocent of the allegation that he had asked Dr. Nichols to backdate a work-release slip and we assume that further investigation would reveal his innocence, would that be sufficient to show pretext? Perhaps, but no evidence in the record supports such a supposition. In fact, after his employment was terminated, Hollander and his wife did go to see Dr. Nichols, and when Hollander asked Dr. Nichols if he would say anything different in the medical record notes, he indicated he would not. Therefore, any further investigation by CCBCC would have revealed nothing more than what it already thought had happened  that Hollander had attempted to have Dr. Nichols falsify a work-release slip for him.
Dr. Nichols's medical record notes of September 8, 1999, incorrectly indicated that he saw Hollander on that date; no evidence in the record, however, indicates that the incorrect medical record had any effect upon Clayton and Talley's decision to terminate Hollander's employment, or that Clayton and Talley, if they had known that the record was incorrect, would not have terminated Hollander's employment, or that Clayton and Talley themselves had falsified records for the purpose of creating a pretext for terminating Hollander's employment. Hollander himself testified that he knew of no reason to think that at the time his employment was terminated CCBCC knew that Dr. Nichols's notes were inaccurate insofar as they indicated that he saw Hollander on September 8, 1999.
Hollander asserts that he had no incentive to have a work-release slip backdated to before September 1, 1999, because he was off work from August 27 until August 31 not because of the August 27 injury but because those days were his normal "off days." This fact, however, does not explain the motivation for CCBCC's termination of Hollander's employment. In fact, if we accept everything that Hollander says as true, including that he never asked Dr. Nichols to backdate any document, it still would not change the fact that CCBCC thought that, based on Dr. Nichols's note indicating that Hollander had asked him to backdate a work-release slip, dishonesty was a legitimate basis for firing Hollander and that an investigation would not have changed CCBCC's decision.
If Hollander had shown that CCBCC had acted in a discriminatory manner and had made it a practice not to investigate allegations of dishonesty against employees who had filed workers' compensation claims, Hollander might have been able to prove that CCBCC's reason for terminating his employment  dishonesty *133 was a pretext. Assuming CCBCC acted too quickly in terminating Hollander without a thorough investigation, that might be sufficient evidence of a pretext. Hollander, however, did not present any such evidence. Hollander failed to offer any evidence, much less substantial evidence, indicating that CCBCC terminated his employment solely because he had filed a workers' compensation claim.
The evidence in the record shows no causal connection between Hollander's filing of a workers' compensation claim and the termination of his employment. Hollander presented no evidence indicating that CCBCC used dishonesty as a pretext for terminating employees who had filed workers' compensation claims, that CCBCC's termination of Hollander violated any company policy, or that CCBCC ever acknowledged that its stated reason for terminating Hollander's employment was pretextual. Therefore, CCBCC's stated reason for terminating Hollander's employment precludes a finding that the fact that he filed a workers' compensation claim was the "sole" cause of his termination.

Conclusion
We reverse the trial court's order denying CCBCC's motion for a JML and remand the case for the trial court to enter a judgment as a matter of law in favor of CCBCC. Our resolution of this issue pretermits our consideration of the other issues raised by CCBCC.
REVERSED AND REMANDED.
HOUSTON, SEE, and BROWN, JJ., concur.
HARWOOD, WOODALL, and STUART, JJ., concur in the result.
LYONS and JOHNSTONE, JJ., dissent.
LYONS, Justice (dissenting).
In Alabama Power Co. v. Aldridge, 854 So.2d 554, 567 (Ala.2002), this Court stated:
"Aldridge points to this Court's decision in Culbreth [v. Woodham Plumbing Co., 599 So.2d 1120 (Ala.1992)], which stated: `If the plaintiff's prima facie case is strong, and the defendant's evidence of an asserted reason is weak or equivocal, the jury might simply disbelieve the defendant.' 599 So.2d at 1122."
The reason the employer gave for discharging the employee in Aldridge was that he had misrepresented why he had missed work. After sifting through the evidence in Aldridge and finding that the evidence for discharging the employee for misrepresentation was undisputed, this Court stated:
"The evidence of Aldridge's misrepresentation as to why he missed work on February 17 is neither `weak' nor `equivocal,' and a jury would have no basis to `simply disbelieve' APCo."
854 So.2d at 569. Consequently, the jury in Aldridge had no basis for disbelieving the reason the employer proffered for discharging the employee.
The resolution of this case turns upon whether the evidence submitted by CCBCC concerning its stated grounds for discharging Hollander is weak or equivocal, allowing the jury to disbelieve it. As this Court stated in Aldridge,"[w]hether the plaintiff's prima facie evidence is strong and the defendant's evidence is weak or equivocal and therefore subject to disbelief by a jury, as recognized in Culbreth [v. Woodham Plumbing Co., 599 So.2d 1120 (Ala.1992)], must be determined on a case-by-case basis." 854 So.2d at 568.
I dissented in Tyson Foods, Inc. v. McCollum, 881 So.2d 976 (Ala.2003), in *134 which the majority of this Court found that the testimony of the employer's agent that he knew only that the employee had been injured on the job but did not know that the employee had filed a workers' compensation claim established, as a matter of law, that the discharge had nothing to do with the employee's claim. I agreed with Justice Johnstone's conclusion in his dissent that "Smith's [the corporate official who fired the employee] position as processing superintendent with authority to terminate employees, together with his knowledge of the plaintiff's on-the-job injury, supports a reasonable inference that Smith knew or deduced that the plaintiff had filed a workers' compensation claim." 881 So.2d at 986. I concluded that the jury in that case was entitled to disbelieve that testimony in light of the undisputed evidence that the employee's injury resulted in the loss of a part of a finger.
We are presented in this case with the same question  what evidence is necessary to give rise to a jury question when the employer's evidence, if believed, is fatal to the employee's claim. The jury had before it evidence from which it could conclude that CCBCC's documentation of Hollander's injury had been falsified or, at the very least, was inaccurate and incomplete. The jury also had before it evidence that Hollander's superiors at CCBCC had a negative attitude toward him after his injury. The majority accepts CCBCC's right to take at face value a note from Dr. Lee Nichols, a physician at the medical clinic used by CCBCC, stating that Hollander had asked him to backdate a work-release slip, giving rise to CCBCC's alleged sole basis for discharging Hollander. But, as CCBCC points out in its reply brief, "Even assuming, arguendo, that Dr. Nichols was mistaken about or misunderstood Hollander's request, unless CCBCC knew that Dr. Nichols's accusation was groundless, CCBCC still had a legitimate independent basis for terminating Hollander, based on the note." (Emphasis added.)
The evidence before the jury indicated that the same doctor's note dealing with Hollander's alleged request for a backdated work-release slip also indicated that Dr. Nichols had performed a physical examination of Hollander on that date, which Dr. Nichols subsequently recognized was erroneous in view of the evidence indicating that Hollander's contact with Dr. Nichols on that occasion was by telephone. When coupled with Hollander's testimony in which he denied making a request for a backdated work-release slip, this rather remarkable error in Dr. Nichols's note brings into question the credibility of Dr. Nichols's entire testimony, including his testimony that he was unaware of any relationship between CCBCC and the clinic he was employed by and his lack of knowledge of any of the individuals at CCBCC who were accused of participating in Hollander's discharge. Whether the discrepancy in the note containing observations about a physical examination that never took place was simply an innocent oversight or part of a conspiracy between CCBCC and its medical clinic to create a false medical record was a jury question.
If the jury rejected Dr. Nichols's testimony and took into account the evidence concerning CCBCC's inaccurate and incomplete handling of Hollander's claim, its possible falsification of records, and the negative attitude Hollander's superiors had toward him after his injury, then the jury was entitled to conclude that CCBCC procured a falsified note and used it as a pretext for firing Hollander, thus establishing that CCBCC knew that Dr. Nichols's allegation that Hollander had asked him to backdate a document was groundless.
I must therefore respectfully dissent.
*135 JOHNSTONE, Justice (dissenting).
I respectfully dissent. While the main opinion correctly recites that the applicable standard of review requires that "we review the evidence in a light most favorable to the nonmovant[, the plaintiff-employee in this case,]" American Nat'l Fire Ins. Co. v. Hughes, 624 So.2d 1362, 1366 (Ala.1993) (citing Ritch v. Waldrop, 428 So.2d 1 (Ala.1982)), the main opinion does not state the evidence in accordance with this requirement of the standard of review.
The record in this case contains substantial evidence that the defendant-employer discharged the plaintiff solely because he claimed worker's compensation and that the defendant-employer falsified its records and reports of the plaintiff's injury and claim, first, for the purpose of defeating his claim and, second, as a pretext for discharging him. Thus, I respectfully submit that we should affirm the judgment of the trial court.

On Application for Rehearing
PER CURIAM.
APPLICATION OVERRULED.
SEE, BROWN, HARWOOD, WOODALL, and STUART, JJ., concur.
HOUSTON, LYONS, and JOHNSTONE, JJ., dissent.
HOUSTON, Justice (dissenting).
I am persuaded that Coca-Cola Bottling Co. Consolidated ("CCBCC") knew that Louis Frank Hollander denied ever asking Dr. Lee Nichols to backdate a work-release slip, to misstate or misrepresent anything, or to falsify any medical record of any kind before CCBCC discharged Hollander for dishonesty. Hollander told his supervisor, William Talley, that Dr. Nichols's statement that Hollander had asked him to backdate a work-release slip was untrue. It is without dispute that some portions of the medical records Dr. Nichols kept relating to Hollander were untrue. Therefore, I am now persuaded that whether CCBCC's reason for discharging Hollander was a pretext was for the trier of the fact, who decided this issue in favor of Hollander.
Therefore, I dissent from the denial of rehearing.
NOTES
[1] Section 25-5-11.1 provides:

"No employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits under this chapter or solely because the employee has filed a written notice of violation of a safety rule pursuant to subdivision (c)(4) of Section 25-5-11."
[2] Hollander claims that only Talley informed him that he was being terminated.
[3] Even this explanation was questionable. 854 So.2d at 558.
[4] Actually, Hollander himself admitted in his testimony that the reason stated for his termination was dishonesty.
[5] Whether the records were purposefully falsified or whether they contained clerical errors was a question for the jury. Regardless, Hollander was still under a duty to show that the records indicated pretext on the part of CCBCC.