920 So.2d 1093 (2004)
JIM WALTER RESOURCES, INC.
v.
Vonnie Lee RILES.
No. 2020627.
Court of Civil Appeals of Alabama.
December 3, 2004.
Rehearing Denied January 14, 2005.
Certiorari Denied August 12, 2005.
*1094 Matthew H. Lembke, Philip J. Carroll III, and William Harold Albritton IV of Bradley Arant Rose & White, LLP, Birmingham, for appellant.
Bill Thomason, Charlie Ratcliff, and Becky Thomason of Thomason & Thomason, LLC, Bessemer, for appellee.
Matthew C. McDonald and Edward B. Holzwanger of Miller, Hamilton, Snider & Odom, L.L.C., Mobile, for amicus curiae Business Council of Alabama.
Alabama Supreme Court 1040615.
PER CURIAM.
Vonnie Lee Riles sued his employer, Jim Walter Resources, Inc., seeking to recover workers' compensation benefits for a psychological injury he sustained during the course of his employment with Jim Walter Resources. Riles also alleged a retaliatory discharge in violation of § 25-5-11.1, Ala. Code 1975. The workers' compensation claim and the retaliatory-discharge claim were severed.
The trial court entered a judgment in the workers' compensation case, finding *1095 Riles's psychological injury to be compensable and awarding him temporary total disability benefits. The trial court further found that Riles had not yet reached maximum medical improvement; therefore, it made no determination as to the extent of any permanent disability. The trial court certified the judgment as final pursuant to Rule 54(b), Ala. R. Civ. P., and Jim Walter Resources appealed. This court affirmed the judgment of the trial court entered on Riles's workers' compensation claim. Jim Walter Res., Inc. v. Riles, 903 So.2d 118 (Ala.Civ.App.2004) ("Jim Walter Resources I").
On March 12, 2002, Jim Walter Resources answered Riles's complaint alleging a retaliatory discharge and moved the trial court to transfer the action to the Circuit Court of Tuscaloosa County. The trial court denied the motion to transfer.
Riles's retaliatory-discharge claim proceeded to trial in December 2002. Jim Walter Resources moved the trial court for a preverdict judgment as a matter of law ("JML") at the close of Riles's case-in-chief and again at the close of all the evidence. The trial court denied both motions. On December 12, 2002, the jury returned a verdict in favor of Riles and awarded him $1,000,000 in compensatory damages and $500,000 in punitive damages. The trial court entered a judgment on that verdict on December 30, 2002. That judgment was certified as final pursuant to Rule 54(b), Ala. R. Civ. P.
On January 8, 2003, Jim Walter Resources moved the trial court for a post-verdict JML, or, in the alternative, for a new trial. Jim Walter Resources also moved the court for a remittitur of the compensatory-and punitive-damages awards. Jim Walter Resources' postjudgment motions were denied by operation of law, and Jim Walter Resources appealed. This case was transferred to this court by the supreme court, pursuant to § 12-2-7(6), Ala.Code 1975.
On June 3, 2003, this court reinvested the trial court with jurisdiction for it to enter an order complying with Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), and Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986). The trial court, on July 29, 2003, entered an order remitting the compensatory-damages award to $685,000 and leaving intact the punitive-damages award in the amount of $500,000.
Riles was employed as an underground coal miner by Jim Walter Resources in January 1975. He is a member of the United Mine Workers of America ("the Union"). The Union has a collective-bargaining agreement with Jim Walter Resources that governs, among other things, employee wages and benefits, the procedure for discharging an employee, and the procedure for filling job openings by job bidding based on seniority.
On September 23, 2001, Riles was working the evening shift at the Jim Walter Resources Number Five mine when two explosions occurred. For a detailed recitation of the facts underlying this case, see Jim Walter Resources I. Riles was blown against the "rib"[1] of the mine by the force of the second explosion, striking his neck and shoulder. His physical injuries resolved soon after the explosions. Thirteen of Riles's coworkers died in the two explosions. Following the explosions, the Number Five mine was temporarily closed and Riles was off work.
On October 10, 2001, Riles notified Jim Walter Resources that he was in need of treatment from a mental-health-care professional. He was referred to a company psychologist who in turn referred Riles to *1096 Dr. Glen O. Archibald, a psychiatrist. Riles was first seen by Dr. Archibald on November 6, 2001. Dr. Archibald diagnosed Riles with post-traumatic stress disorder.
Riles was also treated by his personal physician, Dr. David B. Champlin, for his continued anxiety and "genuine morbid fear" of returning to the underground coal mines. Dr. Champlin agreed with Dr. Archibald's diagnosis of post-traumatic stress disorder.
Riles and other employees were called back to work by Jim Walter Resources in December 2001, when the Number Five mine was reopened. Riles presented Jim Walter Resources with letters from Dr. Archibald and Dr. Champlin indicating that he was unable to return to work as an underground coal miner and requesting work on the surface of the mine. Dr. Archibald's letter stated in part:
"Mr. Riles continues to have nightmares of being in the situation and the thought of returning underground continues to cause my patient severe anxiety. Mr. Riles is able to return to work above ground only, as his depressive symptoms have improved, though he has not reached the stage where he would be able to return to work underground.
"I have diagnosed Mr. Riles with: Acute Post Traumatic Syndrome. In my professional opinion I do not think that Mr. Riles is able to return to work underground at this time. Any assistance that could be given to help Mr. Riles return to work in a different capacity would be helpful. Mr. Riles will continue to see me on a regular basis for out patient therapy."
Dr. Champlin's letter stated in part:
"[Riles] was employed underground in the No. 5 mine when the recent explosion occurred tragically killing several men who were his friends. He has, as a result of this, developed a genuine morbid fear of returning to underground mining.
"In my opinion he is not emotionally able to do so. He wishes to return to work for the mine above ground and I would respectfully request that he be allowed to do so."
Ricky Rose, another employee of Jim Walter Resources involved in the explosions, also presented a letter from his treating physician indicating that he was unable to return to work underground.
After Riles and Rose presented their letters to Jim Walter Resources, a meeting was held between officials of Jim Walter Resources and officials of the Union. Riles and Rose did not attend this meeting. Although there were no permanent positions available aboveground, an agreement was reached between Jim Walter Resources and the Union that permitted Riles and Rose to work aboveground through the end of 2001. Mike Hall, Jim Walter Resources' general manager of labor relations, participated in the meeting and testified as follows:
"Q. Was an agreement reached during that week to allow Mr. Riles and Mr. Rose to work on the surface for some period of time?
"A. Yes, sir, there was.
"Q. What was their agreement?
"A. That Mr. Rose and Mr. Riles could work on the surface through the end of the calendar year. And then we would take a look at it after the first of the year.
"Q. What do you mean `we would take a look at it after the first of the year?'
"A. That management would reevaluate the needs and see if they were still there after the holidays were over.

*1097 "Q. Did anybody from the union agree with that approach?
"A. Yes, sir.
"Q. Did that include Mr. Tramell, the president of the union?
"A. Yes, sir.
"Q. Did any on the union side voice any objection to that?
"A. No, sir. They seemed very satisfied with it.
"Q.... Why did y'all let Mr. Riles and Mr. Rose come to the surface to work for that period of time?
"A. Well, we were being asked if we could help them in some way to get through the  the first few weeks to reacclimate back to the workforce. There were some things could be done at that time on the surface in regard to everyone coming back, some clean-up type duties could be done at that time. That was basically the reason for it.
"Q. Was this ever discussed or intended to be a long-term situation?
"A. No, sir. It was just through the end of the year.
"Q. And why not? Why couldn't it be a long-term situation?
"A. If it got beyond something that was a short-term type thing, then we would be in a position where we would be expected to post, it could be considered a permanent vacancy and we would be expected to post the job for a bid.[[2]]
"Q. Was there any meaningful work to be done on a long-term basis?
"A. No, sir."
Gary Tramell, the Union president, attended the meeting and testified that the Union had requested that Jim Walter Resources accommodate Riles's and Rose's aboveground work restrictions and that the Jim Walter Resources' management had said "they had no problem with accommodating the work restrictions." Tramell testified that there was no discussion at this meeting as to the length of time that Riles and Rose would be permitted to work aboveground. However, Tramell stated that when this meeting ended he was asked, as president of the Union, to meet with Hall and Jess Cooley, the mine manager, in another room to discuss the length of time that Riles and Rose would be permitted to work aboveground. Tramell testified:
"Q. Did you agree on a time line?
"A. There was a conscientious agreement that they would go until  that they would be accommodated with their restrictions until the first of the year and then they [would] be reevaluated.
"Q. Be reevaluated after the first of the year?
"A. Right.
Q. And you agreed to that on behalf of the union?
"A. Yes, I agreed to that."
Tramell further testified that the Jim Walter Resources' management expressed some concern as to a possible "ballooning effect" if Riles and Rose were accommodated. He testified as follows:
"Q. Okay. Now, [Tramell], did they ever say anything to you about a fear of a ballooning effect?
"A. I had been in some meetings, and I don't know exactly which one it was. But they did mention that there were, I think, several people involved in *1098 the explosion and that if they would allow more accommodations, that it might balloon.
"Q. And balloon into what?
"A. What I would think or what my interpretation would be is that it would balloon into more people seeking compensation 
"....
"Q. Who said that? Was it somebody from management or somebody from labor?
"A. It was somebody from management. I don't really know exactly who it was but it was in a room. I couldn't pinpoint the manager that it was but it was from management."
Richard Parker, the Union's health and safety representative, also attended the meeting in which Jim Walter Resources agreed to allow Riles and Rose to return to work aboveground. He testified as follows:
"Q. Were you involved in any way with any discussions involved with management or with the union, as to what was going to be done about these doctor's letters that [Riles] brought with him?
"A. I was in a meeting ... around the 10th or 11th of December, excuse me, that when Mr. Riles and also a gentlemen named Mr. Rose came to the mine with those letters, their doctors had prescribed  stating on the letter that they were available for surface work but at that time they were not available for underground work.
"Q. Okay. Did you  Were you involved in any decisions that were made regarding those letters and their ability to return to work?
"A. I was present when the company representative by the name of Dale Byram was present, Jess Cooley, and international representative member Joe Main was present, myself was present in a meeting in the safety office whereas the company and the union agreed that there would be work available for Vonnie Riles and Ricky Rose for an undetermined time on the surface.
"Q. On the surface?
"A. Yes.
"Q. I think you just anticipated my next question. Was there any period of time that that work was going to be made available and then it would stop?
"A. No, sir. No set time line was made available or was expressed at that meeting that I was at."[3]
Both Tramell and Parker testified that Jim Walter Resources was under no obligation to provide surface work for Riles and Rose.
Hall notified Riles by telephone that an agreement had been reached that would permit him to return to work aboveground "through the end of the year" and that "we would take another look at it after the first of the year." Riles testified as to the telephone conversation, stating that Hall told him that he would be permitted to return to work aboveground "until after the first of the year" and that "we will get together on this after the first of the year." The record indicates that there were no aboveground job vacancies that Riles could fill on a permanent basis on either of the three shifts at the Jim Walter Resources Number Five mine. Hall testified that Riles's aboveground duties generally consisted of cleaning the bathhouse and bathrooms and that these tasks were already *1099 the job duties of other employees of Jim Walter Resources.
Riles returned to work at Jim Walter Resources Number Five mine and worked aboveground until after the first of the year. On January 4, 2002, another meeting was held between Union officials and Jim Walter Resources' management. Riles and Rose attended this meeting and were told by Jim Walter Resources' management that they had to return to their regular underground positions the following Monday. Riles testified as to the January 4, 2002, meeting as follows:
"Q. And what happened then?
"A. I [was called] into the office. And Mr. Hall told me that starting Monday morning, my job was  I had to go back to my regular job.
"Q. Which was?
"A. Underground.
"Q. Had you been released to return underground by your doctors yet?
"A. No, I haven't.
"Q. Did you tell Mr. Hall that you had not been released to return underground?
"A. I told him. And I had the letter.
"Q. And what did he tell you when you told him you still had doctor's orders not to go underground?
"A. He said, Monday you will be able to go back to work. Go to your doctor and get him to change your slip. And you will be able to work Monday, underground.
"Q. What if your [doctor] wouldn't change your slip?
"A. I didn't have a job, as far as I am concerned.
"....
"Q. Were they telling you and Ricky Rose the same thing?
"A. Yeah.
"Q. Did either of you ask about workers' compensation at that meeting?
"A. I asked Rose  Rose was actually the one that asked about workers' comp.
"Q. What did they say about workers' compensation?
"A. Mr. Hall said that if you signed the workers' compensation papers, that it would be denied. And if you  [sickness and accident benefits], if we put on there it was work related, it would be denied."
Rose testified as to the January 4, 2002, meeting as follows:
"Q. What did [Hall] say?
"A. [Hall] said that they had met with the international union representatives. I can't recall the man's name they called. And they come up with where the ones that couldn't go underground work outside awhile and to try to help them out. And the time has come for us to go back underground. It was Friday and he said we can work outside Saturday but Monday when we come to work, if we weren't able to go underground, he didn't have anything for us. He said we have to get a release to go to work underground. If we didn't have that, there was nothing available.
"I asked him about workers' compensation and he said that has been denied. I asked what about [sickness and accident] insurance. He said you can get that but you have got to check a certain line. I don't recall what line it was, that you didn't get this at work. And I got it at work. So, I wouldn't sign that form.
"Q. Well, Ricky, did you go back to your doctor to get him to change the excuse?
"A. Yes. I went back to my doctor.
"Q. Did your doctor agree to let you go back underground?

*1100 "A. He didn't want me to go back underground. But I talked to him and persuaded him to let me go. So, he said you can go try it.
"Q. What if you would not have been able to persuade the doctor to change the excuse to allow you to [go to work] underground?
"A. I would have been on the street, the way he talked.
"Q. No job?
"A. No job.
"Q. Have you been working underground since?
"A. Yes."
Clabe Potter a Union representative, was present at the January 4 meeting and testified that Riles and Rose were told by Jim Walter Resources' management that they had to return to their regular underground positions the following Monday. Potter stated that Riles and Rose were told that workers' compensation benefits would be denied but that sickness and accident benefits would be granted "as long as [the psychological injury] wasn't work related."
Tramell attended the January 4 meeting and testified that there was no reevaluation of Riles's and Rose's status by Jim Walter Resources' management and that they were simply told that they had to return to their regular underground positions the following Monday. He further stated that as far as he was concerned Jim Walter Resources had done what it had agreed to do in the December 2001 meeting and that he had no criticism of the way Jim Walter Resources handled Riles's situation.
Hall testified that Jim Walter Resources' management had reevaluated Riles's and Rose's status in January 2002 to determine if there was any meaningful aboveground work for them to perform and that the decision was made by Jim Walter Resources' management that Riles and Rose had to return to their regular underground positions. Hall testified as to the January 4 meeting as follows:
"Q. Tell us what happened at that meeting.
"A. Well, when everybody got in there, I basically told Mr. Rose and Mr. Riles that it looked like Monday that ... you would need to return to your regular job. You know, one of them asked, you know, what if we can't. I said, well, that is a good question. I said hold on a minute. I went out into the payroll office and got a sickness and accident application form and brought it back in to them. I told them if you can't return to work, if you can't get a release from your doctor to do that, then we might want to get this sickness and accident application form completed by him....
"Q. And did Mr. Tramell, the president of the union, or Mr. Potter voice any objection at that meeting or raise any disagreement with the way the company was handling that?
"A. No, sir.
"Q. Why did the company make the decision that Mr. Riles and Mr. Rose should return to their regular jobs underground?
"A. Well, the work that was being performed by them was work that was just really something for them to do for a short-term period of time. It was pretty much done. It was work that other people performed. It had gotten into another year. We were concerned that, you know, again if we didn't go ahead and post a job that was permanent in nature, we would probably end up getting a grievance for people working on the surface for there not being an opening.

*1101 "Q. Was their aboveground work ever intended to be anything that would keep on going on a long-term basis?
"A. No, sir.
"Q. There has been some testimony or suggestion in this case that you told Mr. Riles or Mr. Rose to go get their doctor's orders changed. Did you hear that?
"A. I heard that.
"Q. Did anything like that happen?
"A. No, sir.
"Q. Tell the jury what did happen.
"A. Well, what did happen when I told them they would need to go underground Monday when they asked what happens if we can't, again, I went out and got the sickness and accident form at that point in time and brought it back in. We talked about, you know, going ahead and getting the form filled out. Again, if they were going to be released to return to work, their doctor would have to release them. I certainly wasn't going to try to tell the doctor what to do in that regard because it was between them and the doctor."
Riles did not complete the application for sickness and accident benefits at that time.
Rose returned to his regular underground position the Monday after the meeting, and he has worked in that position since that time. Riles testified that his treating physicians had not removed his restriction of no underground work and that the last date that he worked at Jim Walter Resources was January 5, 2002. The record indicates that Riles is eligible to retire; however, he testified that he had no plans to retire and that he "need[s] to be working." Riles further stated that he does not know whether he will ever be able to return to his underground coal-mining position.
Jim Walter Resources moved the trial court for a pre-verdict JML at the close of Riles's case-in-chief and again at the close of all the evidence, arguing, among other things, that it was entitled to a JML on Riles's retaliatory-discharge claim because, it argued, Riles had not been discharged and had not resigned his employment and continued to be an employee of Jim Walter Resources. Our supreme court has set forth the standard of review for a motion for a JML as follows:
"When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in granting or denying a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). For actions filed after June 11, 1987, the nonmovant must present `substantial evidence' in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Motion Industries, Inc. v. Pate, 678 So.2d 724 (Ala.1996). Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992)."
*1102 Delchamps, Inc. v. Bryant, 738 So.2d 824, 830 (Ala.1999).
Section 25-5-11.1, Ala.Code 1975, provides, in part: "No employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits under this chapter...." Section 25-5-11.1, Ala.Code 1975, "does not require an employer to create a job specifically designed for an injured employee and does not require an employer to provide the employee with special accommodations to allow the employee to perform a job." Bleier v. Wellington Sears Co., 757 So.2d 1163, 1172 (Ala.2000). In order for an employee to establish a prima facie case of retaliatory discharge pursuant to § 25-5-11.1, Ala.Code 1975, the employee must show: "1) an employment relationship, 2) an on-the-job injury, 3) knowledge on the part of the employer of the on-the-job injury, and 4) subsequent termination of employment based solely upon the employee's on-the-job injury and the filing of a workers' compensation claim." Alabama Power Co. v. Aldridge, 854 So.2d 554, 563 (Ala.2002). "An employee is `terminated' if he or she is either fired or `constructively discharged.'" Ex parte Breitsprecher, 772 So.2d 1125, 1129 (Ala.2000). It is undisputed that Riles was not "fired" or discharged by Jim Walter Resources. Riles contended that he was constructively discharged from his employment with Jim Walter Resources on January 5, 2002, and the case was presented to the jury on a constructive-discharge theory.
In order for an employee to establish a claim of constructive discharge, he or she "must present substantial evidence that his or her `employer deliberately [made] [the] employee's working conditions so intolerable that the employee [was] forced into an involuntary resignation.'" Ex parte Breitsprecher, 772 So.2d at 1129, quoting Irons v. Service Merchandise Co., 611 So.2d 294, 295 (Ala.1992). Thus, an employee who has not been discharged, either actually or constructively, has failed to present a prima facie case of retaliatory discharge, and the employer would be entitled to a JML on that claim. See Kent Corp. v. Hale, 699 So.2d 954 (Ala.1997).
Jim Walter Resources argues that Riles never resigned his employment as required in order to establish a constructive discharge. Hall testified that Jim Walter Resources has never discharged Riles and that Riles has never resigned his employment at Jim Walter Resources. Hall further testified that Riles is still employed by Jim Walter Resources and that his job at Jim Walter Resources is still available to him when his treating physicians clear him to return to work. Tramell testified that Riles could return to his position at Jim Walter Resources once he is released by his physicians because he has not been "discharged at this time." Riles, himself, testified that he could return to his job at Jim Walter Resources once he is released by his physicians.
In support of its position that Riles had not resigned his employment and was still employed by Jim Walter Resources, Jim Walter Resources presented evidence indicating that Riles received certain company benefits after January 5, 2002, that only employees of Jim Walter Resources are eligible to receive. Riles and his family were continuously covered under the Jim Walter Resources' health-insurance program in 2002.[4] A copy of Riles's insurance *1103 card was admitted into evidence; that card indicates that the effective date of coverage was January 1, 2002. The health insurance provided by Jim Walter Resources was used to pay for numerous medical expenses incurred by Riles and his family during 2002, including charges incurred on January 15, 2002, January 23, 2002, and February 11, 2002. On August 6, 2002, Riles completed an application to re-enroll in Jim Walter Resources' employee health-insurance program. Jim Walter Resources presented undisputed and uncontradicted evidence indicating that only Jim Walter Resources' employees are eligible for its health-insurance program and that an employee that has been discharged or has resigned is not eligible for coverage.
Jim Walter Resources' employees are entitled to vacation and holiday pay if they are off of work because of an injury or illness. Riles continued to receive vacation and holiday pay throughout 2002. Jim Walter Resources presented undisputed evidence that only employees of Jim Walter Resources are entitled to vacation and holiday pay if they are off the job because of an injury or illness and that employees that have been discharged or who have resigned their employment are not eligible for vacation and holiday pay.
Jim Walter Resources has a sickness and accident benefits program that is available to Jim Walter Resources' employees.[5] These benefits are available to Jim Walter Resources' employees who have become disabled as the result of any sickness or accident occurring on or off the job.[6] The sickness and accident benefits are available to Jim Walter Resources' employees only, and an employee who has been discharged or who has resigned his employment is not eligible for the sickness and accident benefits.
Riles initially refused to complete the application for sickness and accident benefits because he said that Jim Walter Resources' management had told him that he needed to indicate on the application that his psychological injury was not work related. On February 12, 2002, counsel for Jim Walter Resources sent the following letter to the counsel for Riles:
"Confirming our discussion of today, please have your client complete the sickness and accident benefits form that we discussed so that we may begin to process his benefits. If you run into any problem in that regard please let me know. As we discussed, the filing of this form and the acceptance of benefits is without prejudice to the arguments your client is making in the litigation. The payment of the sickness and accident benefits by the company is simply a recognition that Mr. Riles is either (a) entitled to the sickness and accident benefits provided by his employment, or (b) entitled to workers' compensation benefits."
Riles completed the sickness and accident benefits application and began receiving those benefits.
Riles argues that when his shift ended on January 5, 2002, he "went home empty handed with no employee benefits whatsoever" *1104 and that he was constructively discharged at that time; that an agreement was reached with Jim Walter Resources in mid-February 2002, wherein he would receive the sickness and accident benefits without prejudicing his workers' compensation claim or the retaliatory-discharge claim; and that the benefits he received that Jim Walter Resources used to show he was still an employee of the company were part of the sickness and accident benefits package. Riles's argument in this regard completely ignores the fact that only Jim Walter Resources' employees are eligible for sickness and accident benefits; that the effective date of Riles's health-insurance coverage began on January 1, 2002, and continued throughout that year; and that the health insurance provided by Jim Walter Resources paid for medical expenses incurred by Riles and his family on January 15, 2002, January 23, 2002, and February 11, 2002, before he started receiving the sickness and accident benefits.
After reviewing the record, we conclude that Jim Walter Resources presented substantial evidence indicating that Riles has not been discharged and has not resigned his employment with the company at any time. Because Riles failed to present a prima facie case of retaliatory discharge, the trial court erred in failing to grant Jim Walter Resources' preverdict JML. Accordingly, the judgment of the trial court is reversed, and the case is remanded for the trial court to enter an order consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
YATES, P.J., and THOMPSON and PITTMAN, JJ., concur.
MURDOCK, J., concurs in the result, with writing, which CRAWLEY, J., joins.
MURDOCK, Judge, concurring in the result.
Riles left work on January 5, 2002, and for a period of six weeks thereafter he was not compensated under the employer's "sickness and accident" plan, although Riles's counsel later negotiated for Riles the right to receive benefits under that plan. Of even more significance is the fact that Riles has not, since January 5, 2002, returned to his job as an underground miner for the employer or otherwise resumed any work with the employer. In light of this, and in light of the reasons for which I am able to concur in the result reached by the main opinion (as discussed below), I see no need to reach the issue whether Riles is now, or whether since January 5, 2002, Riles continuously has been, an employee of the employer for purposes of the prohibition against discriminatory terminations in § 25-5-11.1, Ala.Code 1975. See Bleier v. Wellington Sears Co., 757 So.2d 1163, 1169 (Ala.2000) (explaining the remedial nature of § 25-5-11.1 and holding that courts "must construe § 25-5-11.1 in a manner that effectuates the obvious legislative intent to protect an employee from a retaliatory discharge based solely on the employee's filing a workers' compensation claim").
What I am prepared to say is that the record does not contain sufficient evidence to support the jury's conclusion that it was the employer that effected any severance of the employer/employee relationship. That is, the record in my view does not support the conclusion that the employer terminated Riles's employment, either actually or constructively. Rather, the record supports the conclusion that it was Riles that did not return to his job as an underground miner and that he failed to do so not because of some action on the employer's part to make his job intolerable and thereby constructively discharge him *1105 from it, but because, quite simply, he was no longer able to perform that job.[7]
CRAWLEY, J., concurs.
NOTES
[1] A "rib" is a support column in a mine.
[2] As mentioned above, the filling of job vacancies is controlled by the collective-bargaining agreement. The collective-bargaining agreement requires Jim Walter Resources to post job openings in a conspicuous place for a period of five days. Employees then bid on the job opening by completing a job-bid form and placing it in a box. The job opening is then filled based on seniority and the ability to perform the job.
[3] It does not appear from the record that Parker attended the meeting that Tramell testified to in which the length of time that Riles and Rose would be permitted to work above-ground was agreed upon.
[4] Jim Walter Resources' health-insurance program is "self-funded" with Jim Walter Resources bearing the costs associated with the insurance. The health-insurance program is administered by Blue Cross Blue Shield of Alabama. Jim Walter Resources' employees are not required to contribute to the cost of the insurance.
[5] The sickness and accident benefits program is "self-funded" by Jim Walter Resources and is administered by Fortis Benefits Insurance Company.
[6] In the event that an employee is injured on the job and the injury is compensable under the Workers' Compensation Act, any sickness and accident benefits received by the employee will be set off from any workers' compensation benefits received by the employee.
[7] Even if it somehow could be said that the employer did discharge Riles, the record still would not support the conclusion that the employer did so because Riles filed a workers' compensation claim, rather than because Riles simply was no longer able to perform his job as an underground miner. As our Supreme Court said in Bleier v. Wellington Sears Co., 757 So.2d 1163 (Ala.2000):

"`"There is a distinction between a termination for the exercise by the worker of his rights under the workers' compensation law and a termination for inability to do the work...."'
"....
"... [T]he employer cannot be penalized for failing to [provide special accommodations] and, instead, discharging an employee who is not able to perform the duties of his job, so long as the discharge is not based on the employee's filing a workers' compensation claim."
Bleier, 757 So.2d at 1170-72 (quoting Cardwell v. American Linen Supply, 843 P.2d 596, 599 (Wyo.1992)) (footnote omitted).