699 So.2d 954 (1997)
KENT CORPORATION
v.
Don HALE.
1950836.
Supreme Court of Alabama.
March 28, 1997.
As Modified on Denial of Rehearing June 20, 1997.
Sydney F. Frazier, Jr., of Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, for appellant.
Ralph E. Coleman of Coleman & Friday, Birmingham, for appellee.
HOOPER, Chief Justice.
Don Hale sued Kent Corporation, asserting that Kent had dismissed him in retaliation for filing a workers' compensation claim. See Ala.Code 1975, § 25-5-11.1, part of the Alabama Workers' Compensation Act. Kent moved for a directed verdict at the conclusion of Hale's case and again at the conclusion of all of the evidence, but its motions were denied. The case was submitted to the jury on the question whether Kent had discharged Hale in retaliation for his filing a workers' compensation claim, and, if so, whether punitive damages should be awarded. The jury returned a verdict for Hale and against Kent, awarding punitive damages of $1,250,000. The court entered a judgment on that verdict. On February 8, 1995, the trial judge overruled a timely post-trial motion raising various alleged errors. Kent appealed. We reverse on the ground of insufficiency of the evidence.

I. Issues
The issues presented for review by this Court are: whether Hale presented substantial evidence supporting his claim of constructive discharge; whether there was clear and convincing evidence that Kent's conduct was so wrongful as to support an award of punitive damages; whether the trial court properly instructed the jury on damages; *955 whether the trial court properly excluded the findings of the Department of Industrial Relations; and whether the reference by Hale's counsel to the defendant's size and wealth was reversible error.

II. Facts
In 1994, Hale was employed by Kent as a "leadman" in the manufacture of metal shelving. On September 2, 1994, Hale suffered an injury to his left wrist, which was cut when he slipped and fell into a machine at the plant. Following treatment for this injury, he was released by Dr. Robert Howe, the plastic surgeon who treated Hale, to return to restricted work on September 6. Kent acknowledged that Hale's September 2 accident was covered by workers' compensation, and it paid all his expenses related to that accident.
On September 6, Hale went back to work. According to Hale, that same day he slipped in some oil and "fell back" on the floor. Hale testified that as a result of this fall he lost feeling in his legs.
James Price and Carlton Smith, fellow employees of Hale, testified that they saw Hale's alleged fall, and they testified that he did not fall to the floor. Price, a welder stationed nearby, testified at trial:
"Q: Could you describe for the jury what you saw Mr. Hale do?
"A: Well, he was kind of standing up like this (indicating) and I usually weld like this, you know, just bring my welder up and shaking it. And I was looking up and he justlooked to me heI thought he washe just kind of eased and laid down.
"Q: Did he slip on something?
"A: No, not that I know.
"Q: Did he trip over anything?
"A: Huh-uh [negative].
At this point in Price's testimony the court allowed Price to demonstrate what he had seen Hale do. Then the questioning resumed:
"Q: ... After he laid down, what did you do?
"A: He started hollering, you know, and I went over to him.
"Q: You went over to him?
"A: Uh-huh [affirmative].
"Q: What did you do?"
"A: I asked him what was going on.
"....
"A: I asked him what was the matter and he said he couldn't move his legs. And I hollered for help.
"Q: Were there any four-by-fours in the area?
"A: There were some over behind the other machine.
"....
"Q: And you walked over there and you picked up one of the four-by-fours. What did you do with it?
"A: He was kind of complaining about his head and I just eased it under there.
"....
"Q: Did you from where you were kneeling right there on the floor with him, did you see any oil or grease on the floor?
"A: No.
"Q: Did you see any oil or grease on his clothes?
"A: Not as I remember."
R.T. 1090-93. Carlton Smith, the other employee who had observed the incident, offered similar testimony:
"Q: Did you have an opportunity to actually see this incident occur?
"A: I did.
"Q: Okay. What drew your attention to Don Hale that day?
"A: He made a moaning sound.
"Q: And did you then look at him?
"A: We turned and looked.
"Q: And what did you see?
"A: I seen Don easing down to the floor.
"Q: You say `easing down.' Was it a fall?
"A: No.
"Q: Can you describe what did happen?
"A: Sort of collapsed, I suppose.
"Q: He collapsed?

*956 "A: But he went down looked like slowly. He wouldn't have been falling real hard, I mean, you know, fast.
"Q: Did he appear to have slipped on anything?
"A: Best of my knowledge, I couldn't tell for sure."
R.T. 1117-18.
Ronald Webb, a former employee of Kent who had been working for Kent on the day of the incident, testified on behalf of Hale. He said that although he did not actually see Hale fall, he did see grease and oil on the floor.[1] However, Kent's safety director, Bill Hyde, testified that he was on the floor talking with Hale after the incident of September 6, and that he did not observe any grease or oil on the floor or on Hale's clothing.
Hale was treated at Carraway Medical Center by Dr. Evan Zeiger, a neurosurgeon, who took an MRI of his spine. The film revealed a left-side disc herniation and no other abnormalities. Dr. Zeiger testified that this disc herniation was compatible with a fall and a strike in the back. However, Dr. Zeiger diagnosed Hale's September 6 paralysis problem as "hysterical paralysis," which he explained "was not an injury." Hale's discharge summary reflected some of the factors that led Dr. Zeiger to this conclusion, including:
"The patient, during his stay in the Neurosurgical ICU, was noticed to have marked movement of both lower extremities while asleep. Upon awakening, the patient once again declared he could not move his lower extremities. The patient was noticed to have movement of his toes to painful stimuli. In addition, when the patient's legs were picked up they were held rigidly. The patient was able to support his leg weight in the air even though he denied voluntary movement of his lower extremities. The patient's legs did not fall when dropped; they were lowered slowly. The patient was noted to have scrotal sensation. The patient was diagnosed with hysterical paraplegia."
C.R. 384. Dr. Zeiger also stated that Hale's complaint of paralysis in both legs was completely inconsistent with symptoms of a ruptured disc. Moreover, he stated, Hale's paralysis would not have disappeared before he left the hospital, if the disc had been the cause of the paralysis.
Dr. Zeiger's diagnosis was confirmed by Dr. Stuart Teiszen, a psychiatrist. Dr. Teiszen further testified that a patient with low intelligence like Hale (who the evidence indicated had an IQ of 55) might respond to a stressful situation or trauma with hysterical paralysis in order to deal with an injury.
After being informed that the evaluation of Hale at that point did not show any acute injury that would cause his paralysis, and that Hale had been diagnosed with "hysterical paralysis," Sharron Harbison, the administrator of Kent's self-insured workers' compensation fund, called Carraway Medical Center and instructed its employees to switch the coverage for Hale's treatment for the September 6 problem from workers' compensation to Hale's Blue Cross-Blue Shield group health insurance policy.
Hale was released from the hospital by Dr. Zeiger on September 9. Following his release, he was seen again by Dr. Howe, who again treated his left wrist. Dr. Howe returned him to work on September 26, again with the restriction that Hale could not use his left hand in his work. Kent assigned Hale to a job that required only the use of one hand.
When Hale returned to the plant for work on September 26, 1994, he was wearing a back brace. Hale testified that he experienced problems with arm and back pain while back on the job on September 26. After working for a few hours the next day, he reported to his supervisor and said that he needed to go home and lie down because of these problems. The safety director, Bill Hyde, insisted on taking him to the company physician, Dr. Walter Wilson. Hale reported a variety of symptoms, including soreness in his shoulders, legs, arms, and back. Dr. Wilson concluded that Hale might have the flu or a viral syndrome and recommended *957 that he see his regular physician. Wilson also testified that Hale did not exhibit any symptoms consistent with disc herniation.
On September 30, 1994, Hale again returned to work at Kent, after his regular physician concluded that he did not have the flu. However, when he arrived for work, Sharron Harbison and Bill Hyde questioned him about the back brace. According to both Harbison and Hyde, Hale said that the back brace had been prescribed by a doctor, but he said he could not recall which one. Hale claims that he told them that he purchased the back brace himself and that no doctor had prescribed it. Ms. Harbison asked Hale for a statement from a doctor regarding his back condition. She testified that she had wanted to ensure, if Hale was having back problems, that any work he was assigned at Kent would not exacerbate the problems.
In response to Ms. Harbison's request, Hale went to Carraway Medical Center on October 3, 1994, and retrieved all of his medical records, and he brought them to the plant the next day. Because Dr. Zeiger had not prescribed a back brace and had released Hale without restrictions relating to his back, Ms. Harbison repeated her request for a statement from a doctor regarding his back condition.
After Hale returned to the plant on October 4, 1994, again without the requested documentation, he met with Sharron Harbison and Bill Hyde; they would not permit him to work without the medical report they had requested. At that point, Hale refused to leave the office. Hyde asked Hale to leave the office. Hyde and Al Richey, a foreman for Kent, were forced to escort Hale off the premises. As they were passing the guard shack, Hale testified, his "leg went out," causing him to sit down. Al Richey took ("snatched," according to Hale) Hale's keys from him and retrieved his car. At that point, Hale said Richey said that if he did not leave, he would be prosecuted for trespassing.[2]
Ms. Harbison testified that Hyde and Richey escorted Hale out because Hale was specifically told that the company needed the information from the doctor regarding why he was wearing a back brace. Harbison said that Kent was under the impression from Dr. Zeiger that there was no physical back injury and that Hale had been completely released to work, but, she said, the back brace was inconsistent with that impression. Therefore, Ms. Harbison said, Kent requested that Hale return to the doctor who had prescribed the back brace and obtain evidence verifying that indeed a doctor had prescribed it. Otherwise, according to Ms. Harbison, Kent would not know where to assign Hale without causing him further injury. Ms. Harbison said that because Hale did not leave, Harbison and Richey asked Hale to leave until he had complied with their request. Ms. Harbison testified that Hale refused to leave, so he was escorted off the premises. It is undisputed that Kent did not terminate Hale on that date.
Following this incident, Kent continued to pay for Hale to be covered on its group Blue Cross-Blue Shield policy, which is available only to employees, and Hale continued to make payments for his own portion of the coverage through February 1995. In addition, Hale was maintained on the employee roster. Kent subsequently inquired as to Hale's condition and offered him several one-hand jobs. In response, Hale's attorney informed Kent that Hale's decision to return to work would depend on his receiving a release from Dr. Walter Whitehurst.[3] However, before Dr. Whitehurst released Hale, Hale announced during his deposition on February 7, 1995, that he had decided that day that he would not return to work at Kent. Hale never provided Kent any evidence that a doctor had prescribed a back brace.

III. Retaliatory Discharge
In reviewing a trial court's denial of a motion for a directed verdict, this Court must *958 apply the substantial evidence rule. This rule requires that, in order to withstand a motion for a directed verdict, the nonmovant must present "`substantial evidence' supporting each element of his cause of action." Hosea O. Weaver & Sons, Inc. v. Towner, 663 So.2d 892 (Ala.1995). "Substantial evidence" is defined as "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to he proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). Moreover, the evidence is to be viewed in the light most favorable to the nonmovant. Renfro v. Georgia Power Co., 604 So.2d 408 (Ala.1992).
Kent asserts that the trial court erred by not granting its motion for a directed verdict, because, it argues there was no substantial evidence that Hale was terminated when he was escorted off Kent's premises. Kent claims that without substantial evidence that he was, in fact, terminated, Hale cannot successfully maintain a claim under § 25-5-11.1 for retaliatory discharge. Section 25-5-11.1 states:
"No employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits under this chapter...."
In order to establish a prima facie case of retaliatory discharge, the plaintiff must present substantial evidence that he was terminated solely for seeking workers' compensation benefits. Keystone Foods Corp. v. Meeks, 662 So.2d 235 (Ala.1995). Constructive discharge is included within the meaning of "terminated" as that term is used in § 25-5-11.1. Twilley v. Daubert Coated Products, Inc., 536 So.2d 1364 (Ala.1988). This Court has defined a "constructive discharge" as a situation in which
"`an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation ... [and the effect of that situation is the same] as if [the employer] had formally discharged the aggrieved employee.'"
Irons v. Service Merchandise Co., 611 So.2d 294, 295 (Ala.1992) (quoting federal cases). Thus, an employee who has not been terminated, either actually or constructively, has not presented a prima facie case of retaliatory discharge, and, in such a case, the defendant would be entitled to a directed verdict on that claim.
Hale asserts that he was terminated. However, viewing the facts in the light most favorable to Hale, this Court cannot agree. Hale returned to work on September 26, and he complained of problems with his arm and back the following day. Hale was taken to the company doctor, who thought he might have the flu. Hale visited his personal physician, who determined that Hale was not ill. When Hale returned again to work on September 30, his time card had been pulled and he was informed that he could not work until he obtained and presented a doctor's prescription for the back brace he was wearing. The following day, Hale brought his medical records, but those records did not indicate that he should be wearing a back brace. Ms. Harbison refused to let Hale work until he presented evidence from a doctor regarding the back brace. Ms. Harbison claims that this was to ensure that Hale was not assigned to any work that would aggravate his condition.
After the meeting with Ms. Harbison and Mr. Hyde regarding the back brace, Hale refused to leave the office and was escorted off the premises by Al Richey. At that time, Richey allegedly told Hale that if he did not leave he would be arrested for trespassing. There was testimony that it was Kent policy that when it terminated a worker, the worker was escorted off the premises, but company policy was also to give the former employee his or her final paycheck. Kent did not give Hale his final paycheck that day. In fact, Kent continued to cover Hale on its employees' group health insurance policy, to pay for his insurance, and to list him as an employee until February 7, 1995, the day he announced at his deposition that he would not return to work at Kent.
In January 1995, Kent offered Hale four one-hand positions with the company, but Hale's attorney informed Kent that any such *959 decision could not be made until Hale had been released for work by his doctor. At Hale's deposition on February 7, 1995, he stated that he had considered himself to be an employee of Kent until that day and that he had that day decided that he no longer wanted to be an employee of Kent. At trial Hale stated that his decision to leave Kent was based on the deposition testimony of Ms. Harbison and Mr. Hyde that he had heard earlier on the day of his own deposition. Hale's announcement on February 7, 1995, that he had decided to terminate his employment with Kent was evidently based on the disagreement he had with Kent over whether his claim should be covered by workers' compensation instead of by Blue Cross-Blue Shield.
We conclude that Hale did not present substantial evidence to support a finding of each element of his claim of retaliatory discharge. The evidence presented to support Hale's assertion that he was discharged when he was escorted off Kent's premises was not "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment [could] reasonably infer" that Hale had been terminated, either actually or constructively. Hale admitted that he himself made the decision that he would no longer be employed by Kent, and that he made that decision at his deposition, approximately four months after he had been escorted off Kent's premises. Moreover, we find Kent's argument that Hale had not suffered an injury that was covered by workers' compensation to be reasonable. We do not consider Kent's decision not to treat Hale's injuries as covered by workers' compensation, coupled with Kent's escorting Hale off the employment site, to be conditions so intolerable as to constitute a constructive discharge. Therefore, we conclude that the trial court erred in not directing a verdict in favor of Kent on Hale's retaliatory discharge claim.

IV. Conclusion
Kent has raised other issues, but, given our holding that Hale did not present substantial evidence to support his claim of retaliatory discharge, we need not discuss those issues.
The judgment is reversed, and a judgment is rendered for the defendant Kent Corporation.
REVERSED AND JUDGMENT RENDERED.
MADDOX, SHORES, and SEE, JJ., concur.
COOK, J., concurs specially.
HOUSTON and BUTTS, JJ., concur in the result.
KENNEDY, J., dissents.
COOK, Justice (concurring specially).
I concur in Chief Justice Hooper's opinion. I write specially to acknowledge a fact not addressed by the plaintiff. The facts of this case are confusing; however, one fact exists that the plaintiff fails to refute and which is inconsistent with an actual or a constructive termination. Even after the incident when Kent Corporation employees escorted the plaintiff off Kent's premises, Kent Corporation continued to cover the plaintiff's medical expenses under its Blue Cross/Blue Shield group insurance. The plaintiff fails to address this fact, which directly contradicts his claim of constructive termination.
KENNEDY, Justice (dissenting).
This Court is not at liberty to vacate a jury's verdict merely because it does not conform to the Court's personal view of the evidence. Senn v. Alabama Gas Corp., 619 So.2d 1320 (Ala.1993). That is what the majority has done in this case; therefore, I must dissent.
NOTES
[1] Webb also testified that Al Richey, a foreman for Kent Corporation, had offered him $2,300 and his old job back if he would testify in court for Kent Corporation.
[2] Hyde was not present when this statement was allegedly made by Richey.
[3] Hale had been treated for the herniated disc by Dr. Whitehurst after being released from the hospital. Dr. Whitehurst performed surgery on Hale's back for the ruptured disc on October 21, 1994.