937 So.2d 491 (2006)
Terry FORD
v.
CARYLON CORPORATION, INC., et al.
No. 1040554.
Supreme Court of Alabama.
February 24, 2006.
*493 Arlene M. Richardson of Richardson Legal Center, LLC, Hayneville; Michael Guy Holton, Pike Road; and Tommy Allen French of Robert B. French, Jr., P.C., Fort Payne, for appellant.
Joseph H. Driver and Thomas S. Thornton III of Carr, Allison, Pugh, Howard, Oliver & Sisson, P.C., Birmingham, for appellees Carylon Corporation, Inc., and Chris Eady.

On Application for Rehearing
HARWOOD, Justice.
We overrule the application for a rehearing filed by Carylon Corporation, Inc. ("Carylon"), and Video Industrial Services ("Video"). However, in reviewing the original briefs of the parties in the process of considering that application, we noted material that persuades us to withdraw our original opinion and substitute one incorporating a different rationale at one point. Accordingly, the opinion released on November 10, 2005, is withdrawn and the following substituted therefor.
Terry Ford appeals from a summary judgment in favor of Carylon, Video, and Chris Eady (collectively "the defendants").
Ford sued the defendants alleging that he had been injured as a result of their willful conduct in removing a safety device from a machine he used as an employee of Video, referencing § 25-5-11(c)(2), Ala. Code 1975, and that they had subsequently discharged him from employment in retaliation for filing a workers' compensation claim, in violation of § 25-5-11.1. The trial court granted the defendants' motion for a summary judgment as to those claims, without expressing a rationale other than that there were no genuine issues of fact and the defendants were entitled to a judgment as a matter of law. Ford appeals only as to that ruling, although other claims he asserted against the defendants were eliminated by a subsequent summary judgment. We affirm in part, reverse in part, and remand.

Standard of Review
We review a summary judgment de novo, seeking to determine whether the *494 evidence presents a genuine issue of material fact and whether the movant was entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P. If the movant makes a prima facie case that no genuine issue of material fact exists, the burden then shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank, 538 So.2d 794, 798 (Ala.1989). Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). This Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala.1990).

Facts
Video, a subsidiary of Carylon, provides industrial-scale environmental-cleanup and maintenance services. Ford began his employment with Video on March 10, 2001.
On March 23, Ford and his supervisor, Eady, were assigned to clean a water-treatment tank located at the waterworks system of the Water and Sewer Board of the City of Guntersville. The assigned cleanup work entailed the use of an industrial vacuum to remove charcoal, which had been used to filter water processed through the tank, from the bottom of the tank.
The vacuum used is known as an SV-119. It is manufactured and sold by Clean Earth Manufacturing and is the most powerful vacuum Video uses in performing its cleanup services. Regardless of the strength of the particular vacuum used on a job, however, Video has mandatory safety rules regarding the use of all vacuums. Among these is a rule that all individuals performing jobs for which a vacuum is necessary must have in place on the vacuum hose an "in-line relief valve," a device colloquially referred to as a "safety T." In shape, the safety T resembles the capital letter "T" and is used to connect two sections of a vacuum hose, allowing the user quickly to relieve accumulated pressure within the hose. The two hoses joined by the safety T constitute a straight line, connected by the horizontal line at the top of the letter "T." The vertical line in the letter "T" represents the part of the device that juts out from the hose connection at a right angle and contains a valve that can be tripped open by pulling on a rope attached to the valve to relieve vacuum pressure in the hose.
On the morning of March 23, Eady and Ford arrived at the waterworks system and proceeded to a building that housed two water-treatment tanks. Eady prepared to clean the first tank by removing a six-inch diameter flexible hose from the vacuum truck, connecting it to the vacuum, and lowering the hose into the tank. Eady did not install a safety T anywhere along the length of the hose. He began vacuuming the charcoal, eventually entering the tank in order to reach the bottom layers of charcoal. When he finished vacuuming the entire tank, he emerged, and he and Ford drove the vacuum truck to a remote location where they deposited the charcoal refuse.
The two returned to the waterworks, at which point Eady instructed Ford to clean the second tank. Ford had observed the vacuuming process, but he had never before manned the vacuum hose. Ford undertook to perform the task in a manner similar to the manner in which he had seen Eady perform it. After he had been vacuuming the tank for approximately 30 minutes, and while he was inside it, a large *495 chunk of solid charcoal entered the vacuum hose. The chunk stopped suddenly at a bend in the hose, and the impact caused the hose to jerk suddenly out of Ford's hands, in turn causing the hose to flail about as Ford attempted to recapture it. The hose came within inches of Ford's hand and, given its strong suction power, drew Ford's hand into the hose and drew itself up Ford's arm, stopping only at Ford's shoulder. The tremendous force of the vacuum caused Ford's shirt sleeve to rip from his shirt and caused a significant amount of blood to be drawn from other areas of Ford's body into his arm and hand, thus decreasing blood flow elsewhere in his body, and eventually causing Ford to collapse; Ford, however, did not lose consciousness.
When the hose initially attached to Ford's arm, Ford began screaming for Eady, but Eady did not respond. Only when Eady began to hear the machine "bog down" did he turn off the vacuum. At this point, Ford was able to free his arm from the hose, and he saw that his arm had at least tripled in size. Paramedics were called to the scene, and Ford was taken to Guntersville Hospital; he was soon transported via helicopter to a trauma center at the University of Alabama-Birmingham Medical Center ("UAB"). UAB surgeons operated on Ford's arm on three separate occasions, and Ford was required to undergo physical therapy and psychological treatment.
On Monday, December 10, 2001, nearly nine months after his injury, Ford returned to work at Video. On Monday, February 4, 2002, his employment was terminated. Because our evaluation of Ford's retaliatory-discharge claim requires, under the legal precedent hereinafter discussed, that we consider the totality of the facts leading up to that termination, we will set out the facts chronologically in all pertinent detail. In that regard, obedient to the controlling standard of review, we have accepted as true those facts in the record most favorable to Ford, resolving all reasonable doubts in his favor. Hanners, supra. Therefore, relying on Ford's version of events wherever there is any dispute between the parties as to what actually happened, we construe the relevant events to be as follows:
Ford reported to work on the morning of December 10, 2001, pursuant to instructions from Video's workers' compensation case manager. Upon returning to work, Ford first encountered Donnie Keith, a superintendent, who instructed him to wait in the office. Video's general superintendent, Don Tyler, then appeared and told Ford "to go stand out in the shop," which he did "for about three and a half hours." He was then dispatched to ride around in a truck driven by another employee, which he did for the remainder of the day. Before departing on that later assignment, however, Ford had informed Tyler that he had an appointment scheduled with his treating psychiatrist, Dr. McInteer, for the next day. Ford was well aware of the established company policy that required employees to telephone the office between 4:30 and 5:00 o'clock each afternoon to learn if they were being assigned to a job the next day, unless they had ascertained that information before leaving work for the day, either from a superintendent or from the posted work schedules. Employees were allowed time off for a doctor's appointment, however, and if an employee properly advised company personnel that he or she was going to a doctor on a particular date, the employee would not otherwise need to check in at the office concerning the availability of work.
Despite the fact that Ford had advised Tyler of his doctor's appointment scheduled for Tuesday, December 11, when *496 Ford did not report to work that morning, Keith wrote up an "Employee Warning Notice," citing Ford for "disobedience" because he had not shown up for work or called in to advise that he would be off. A copy of the notice was placed in Ford's file, and Ford was suspended from work for Wednesday, December 12. Having telephoned the office that Wednesday afternoon, however, to check on the availability of work, Ford reported back to work the morning of Thursday, December 13. Keith called him into the office, told everybody else to leave the office, and handed Ford a copy of the warning notice. He told Ford that he was tired of all the other employees' complaining about Ford's being there and that those other employees were not going to do Ford's job for him. Ford was then assigned to flag traffic with a work crew.
On Friday, December 14, Ford was sent to Decatur, Alabama, and the company employee to whom he was assigned once he arrived advised him that the work involved "vacuuming out tanks and water blasting." Ford advised the employee that he could not hold a water blaster with his injured arm and that he was not "going to put [himself] into another tank and get caught in that thing again." When the employee telephoned Keith to advise him of the situation, Keith instructed Ford to return to the company's office in Birmingham. There Ford was taken into the office for a meeting with Keith, Tyler, and the president of Video, John Kulbitskas. Kulbitskas insisted that Video had a letter stating that Ford could lift 80 pounds or more after the accident, but when Ford asked to see the letter, Kulbitskas would not show it to him.
Unbeknownst to Ford, Tyler wrote up another "Employee Warning Notice" that day, citing Ford for being "uncooperative" because Ford had "refused to run vacuum truck and said he would not operate water lance due to his condition of his arm. He also stated he was hired back for TV work[1] only." Ford, however, had not refused to do the work but had only explained that he was unable to do it. When the workers' compensation manager had told him to report back to work after the accident, she had told him that he was going to be assigned to do only work in the TV trucks. Keith acknowledged in his deposition that he knew that Ford could not "handle holding the water blaster . . . he couldn't handle the cable and TV. He couldn't pick up the camera. That's the reason, you know, he couldn't run the  couldn't do the computer work." Keith testified further that Ford had told him that he was afraid of the vacuum trucks because of his experience and that Keith had run out of jobs to which he could assign Ford.
From Monday, December 17 through Friday, December 21, Ford worked daily flagging traffic, as instructed. No work was scheduled on Monday, December 24, or Tuesday, December 25, Video apparently being closed those two days for the Christmas holiday. On Wednesday, December 26, 2001, Ford reported back to work and flagged traffic as instructed and did likewise on Thursday, December 27, and Friday, December 28. Following the weekend of December 29 and 30, the company was to be closed on New Year's eve, December 31, and New Year's day, Tuesday, January 1, 2002. Before leaving work on Friday, December 28, Ford advised Tyler *497 that Ford had a doctor's appointment scheduled for Monday, January 7.
On Wednesday, January 2, 2002, Video was shut down as the result of an ice storm; when Ford telephoned the office that evening and spoke with Keith he was advised that there would be no work available for him on Thursday, January 3. When Ford telephoned the office on Thursday, January 3, Keith advised him that there would be no work available for Friday, January 4.
On Monday, January 7, Ford kept his doctor's appointment and then went straight to the Video office with his "slip" from the doctor, arriving there before lunch. Ford testified that the following occurred upon his arrival:
"That's when [Kulbitskas] went into one of his little spouting moods. And he started  every time I tried to explain something to him, he'd holler `bullshit, bullshit.'
"And I just told him  I just told him out of respect for you, and out of respect for me don't cuss me or don't cuss at me. And he got up and stuck his finger in my face and told me, `I'm sick of all of this, it's going to be my way or no way.' And then he walked out of the office and went over to where the ladies work. And then Don Tyler handed me my paycheck and said `See ya.' And then I walked out and got in my car and left."
That same day, Tyler wrote an official letter-form memo addressed to Ford, sending copies to Keith, Kulbitskas, and the company safety director and placing a copy in Ford's personnel file. The letter asserted that Ford had telephoned Tyler on January 2 to advise that he would not be at work on January 7, but that Ford had not advised that he would not be at work on January 3 or 4, or that his arm was giving him trouble and he was going to the doctor. Ford testified in his deposition that he did not talk to Tyler on January 2. The memo declared that the incident represented "the second time in which you have neglected to call for scheduling following a no-show by you for work," and advised that should Ford "fail again to call in for scheduling or neglect to inform this office with regard to your availability to work we will have no other option than to immediately terminate your position." The memo closed by reminding Ford that he was "to call in for scheduling between 4:30 p.m. and 5:00 p.m. Monday through Friday unless there is a schedule posted on the board and you are physically able to view it."
The evening of Monday, January 7, Ford telephoned the office and spoke with someone who he believes was Keith who told him to report to work the following day. He did so and was again assigned to flag traffic. At the end of that January 8 shift, Keith told him to report to work the next day. On Wednesday, January 9, he was again given the job of flagging traffic and again was told by Keith at the end of the shift to report the next day. He flagged traffic on Thursday, January 10, and advised Tyler that he had an appointment with Dr. McInteer at the rehabilitation center the following day, Friday, January 11, and an appointment with "Jerry Clug for an evaluation on my hand" on Monday, January 14. The evening of Monday, January 14, Ford telephoned the office and was instructed by Keith to report for work the next day. He worked flagging traffic on Tuesday and Wednesday, January 15 and 16. At the end of the workday on January 16, Keith told him there would be no work for him on January 17, but to check in with the office that afternoon. Ford did so and also telephoned the office on Friday, January 18, Monday, January 21, Tuesday, January 22, Wednesday, January 23, and Thursday, *498 January 24. On each occasion, Keith told him that there was no work available for the following day, but to check back at the end of the following day.
On Friday, January 25, 2004, Ford had to be away from home to accompany his father on an errand and told his mother that if he was not back in time to call the office, for her to telephone on his behalf to find out if Video would have any work for him on Monday, January 28. His mother did so, and spoke with Donnie Keith. Keith told her to tell Ford that "[h]e would call me when he had something, otherwise not to worry about it."
Ford heard nothing further from anyone at Video until, on either February 6 or 7, he received a letter that had been written by Kulbitskas on February 4, which stated, in pertinent part:
"Dear Mr. Ford:
"As per our past discussion and memos to you, you have failed to contact this office regarding any availability for work. On January 25, 2002, your mother, not you[,] called to see if work was available. This was the last contact Video has had with `you.' Since you have not contacted this office for work this constitutes a voluntary resignation on your part."
Ford did not attempt to contact Kulbitskas, because "I just went by what the letter said, that I was terminated." Based on Keith's instructions to Ford's mother, Ford had understood that he was relieved of the responsibility of telephoning at the end of each day to see if work was available the next day, company policy requiring only that he do so "unless told otherwise"; he believed he had been "told otherwise."

Analysis
Ford argues that the trial court erred in entering a summary judgment for the defendants as to his retaliatory-discharge claim and his willful-removal-of-a-safety-device claim, the latter of which he characterizes as an intentional-trespass claim. He contends that he presented substantial evidence indicating that the termination of his employment was in retaliation for his filing a workers' compensation claim and that the defendants are liable in trespass for Eady's failure to install the "safety T." (Ford's brief, at 40.)

I. Retaliatory Discharge
At the outset, we note that Carylon is the parent corporation of Video. A parent corporation generally cannot be held liable for the acts of its subsidiary unless the latter's corporate veil can be pierced as a result of the parent's abuse of control. Environmental Waste Control, Inc. v. Browning-Ferris Indus., Inc., 711 So.2d 912, 914 (Ala.1997). There is not the faintest suggestion that Carylon used Video as its "alter ego"; thus we affirm the summary judgment as to Carylon. Further, because the retaliatory-discharge statute, quoted below, refers to an employee's being terminated "by an employer," Ala.Code 1975, § 25-5-11.1, this claim could be brought against Video only, not Eady, and we affirm the summary judgment for Eady on the retaliatory-discharge claim. Therefore we will consider Ford's retaliatory-discharge claim only in relation to Video.
Generally, an employment contract for an indefinite period is terminable at will for any reason or for no reason. Webb Wheel Prods., Inc. v. Hanvey, 922 So.2d 865, 870 (Ala.2005); Tyson Foods, Inc. v. McCollum, 881 So.2d 976, 978 (Ala.2003). Section 25-5-11.1, Ala.Code 1975, sets out an exception to the employment-at-will doctrine. It provides, in pertinent part:
"No employee shall be terminated by an employer solely because the employee has instituted or maintained any action *499 against the employer to recover workers' compensation benefits under this chapter . . . ."
(Emphasis added.)
Before a trial court, a plaintiff bears the initial burden of making a prima facie showing of the elements of a retaliatory-discharge claim. McCollum, 881 So.2d at 979. These elements are:
"1) an employment relationship, 2) an on-the-job injury, 3) knowledge on the part of the employer of the on-the-job injury, and 4) subsequent termination of employment based solely upon the employee's on-the-job injury and the filing of a workers' compensation claim."
Alabama Power Co. v. Aldridge, 854 So.2d 554, 563 (Ala.2002). Once this showing has been made and supported, the burden then shifts to the defendant, who must provide substantial evidence indicating a legitimate reason for the discharge, after which the burden shifts back to the plaintiff to demonstrate by substantial rebuttal evidence that the defendant's reason or reasons are not true, but pretextual. 854 So.2d at 567.
It is undisputed that Ford proved the first three elements of a prima facie case. As to the third element, Kulbitskas acknowledged in deposition testimony that when he wrote his letter to Ford on February 4, 2002, he knew that Ford had filed a workers' compensation claim: "That was no big secret. I mean, you know, the guy was hurt pretty bad. He was on workman's comp." Video contests only element four, arguing that Ford has not proved by substantial evidence that his employment was terminated, as opposed to his having voluntarily resigned; and, Video argues, even if he has shown that his employment was terminated, Ford has not shown that it was terminated solely because he filed a claim for workers' compensation benefits.
Video argues that Ford's failure to telephone the company beginning January 25 to check on the availability of work and his acquiescence in the content of the February 4 letter demonstrate his voluntary resignation, thus rendering § 25-5-11.1, which deals only with terminations, inapplicable. See, e.g., Kent Corp. v. Hale, 699 So.2d 954, 958-59 (Ala.1997) (employee who chose to discontinue his employment could not maintain retaliatory-discharge action).

A. Prima Facie Case  Voluntary Resignation Versus Termination
In its brief to this Court, Video uses the term "voluntary resignation" to describe two separate incidents. Initially, the term is used to refer to Ford's failure to telephone Video to check on the availability of work beginning January 25, when Ford's mother  not Ford  telephoned Video, or at the latest, January 26. Video later uses the same phrase to refer to Ford's failure to challenge in any way the content of the February 4 letter he received from Kulbitskas.
Regarding Ford's failure to telephone Video, Video offered the "Third Affidavit of John Kulbitskas," in which he stated:
"On or about February 4, I issued a letter to [Ford] regarding his voluntary resignation. When I wrote this letter, to the best of my knowledge, [Ford] had not called to report in as required from January 25, 2002, through February 4, 2002. Moreover, to the best of my knowledge, neither I, nor any other representative of [Video] had relieved [Ford] of this requirement."
Given Ford's rendition of Keith's instructions to Ford's mother during their January 25 telephone conversation, which version controls our view of the facts (and Video has offered no contrary version from Keith), Ford's discontinuation of "check in" calls to Video did not indicate a resignation. *500 He understood that Keith would initiate contact when there was work for Ford to perform and that otherwise Ford was "not to worry about it."
Video argues that Ford's failure to respond to the February 4 letter from Kulbitskas indicated his agreement with the underlying premise of the letter  that he had, in fact, resigned. This argument is meritless, if for no other reason than it implies that Ford's failure to respond to the letter caused his actual discharge. Moreover, Ford argues in his brief that "[t]his letter from John Kulbitskas left no opening for Ford to contest the findings or allow him an opportunity to explain the circumstances. Therefore, Ford did not respond and felt he had been fired, with no recourse." As earlier noted, in his deposition Ford testified that he did not telephone Video to protest the letter because, "I just went by what the letter said, that I was terminated."
Construing the facts most favorably to Ford, as our standard of review compels us to do, we conclude that a genuine issue of material fact exists as to whether Ford "resigned" under either theory advanced by Video.

B. Prima Facie Case  Causal Connection
It is essential that a plaintiff in a retaliatory-discharge action make a showing that the filing of a workers' compensation claim was the sole cause of the plaintiff's subsequent discharge. Aldridge, 854 So.2d at 563.
"Circumstantial evidence of a causal connection between a workers' compensation claim and an employee's discharge is appropriate in a retaliatory-discharge action. Culbreth v. Woodham Plumbing Co., 599 So.2d 1120 (Ala.1992). This Court identified in Aldridge certain factors that can be considered as circumstantial evidence of a causal connection between an employee's filing a workers' compensation claim and that employee's discharge[:]
"`"1) knowledge of the compensation claim by those making the decision on termination, 2) expression of a negative attitude toward the employee's injured condition, 3) failure to adhere to established company policy, 4) discriminatory treatment in comparison to similarly situated employees, 5) sudden changes in an employee's work performance evaluations following a workers' compensation claim, and 6) evidence that the stated reason for the discharge was false."'
"854 So.2d at 564-65 (quoting Chhim v. University of Houston, 76 S.W.3d 210, 218 (Tex.Ct.App.2002)). Furthermore, we observed that `[m]any states also consider "[p]roximity in time between the filing of the workers' compensation claim and discharge" a persuasive factor in establishing a causal connection.' Aldridge, 854 So.2d at 565 (quoting Rebarchek v. Farmers Coop. Elevator & Mercantile Ass'n, 272 Kan. 546, 555, 35 P.3d 892, 899 (2001))."
Flint Constr. Co. v. Hall, 904 So.2d 236, 248 (Ala.2004).
In this case, Ford presented substantial evidence of an official expression of a negative attitude toward his injured condition, by means of Keith's assertion that other employees were complaining to him about Ford's being on the job but not doing his job, which they indicated they were not going to do for him. Likewise indicative of a negative attitude was Kulbitskas's angry confrontation with Ford when Ford reported to the office after his doctor's appointment on January 7, 2002, which had been preapproved.
More fully developed, however, is Ford's evidence of Video's failure to adhere to *501 established company policy in reacting to Ford's absences from work. Under his version of the facts, which controls our review, see Hanners, supra, he faithfully telephoned to check on the availability of work and reported to work whenever he was instructed, bypassing available work on only three days when he had doctor's appointments that he had cleared in advance with Don Tyler. Even then, on January 7, he came to the office immediately after his visit with the doctor. After he had complied with company policy by telephoning Donnie Keith in advance of each scheduled workday following his last assigned work day of January 16, 2002, and had been told on seven successive occasions that there was no work available to him, he was advised by Keith, through his mother, that Keith would call him when Video had any work for him to do, but "otherwise, not to worry about it." Thereafter, no one from Video attempted to telephone or otherwise contact Ford, but his employment was terminated on February 4 on the asserted basis that he had not made the necessary contacts with Video.
Kulbitskas explained in his deposition that under company policy an employee would not be disciplined for not calling in one time, although they might be disciplined after two times and "it might go to three," and that if an employee did not call in, "usually the first couple of times, it's verbal." He explained that "[t]hen a written notice" is sent and "then if they don't call in" it is assumed they have voluntarily resigned. "But by the third day or so" Video would be wondering where the employee was "so we try to call them. Because we call employees." Kulbitskas testified that it was "fine" for an employee to take time off for a doctor's appointment upon advance notice to Video.
Accordingly, Ford sufficiently established that Video had failed to adhere to established company policy in terminating his employment on February 4, 2002, so as to make out, by circumstantial evidence, a prima facie case of causal connection between his workers' compensation claim and his discharge. The burden then shifted to Video to prove that it had a legitimate reason for terminating Ford's employment.

C. Video's Proffer of a Legitimate Reason for Discharging Ford
Once a plaintiff in a retaliatory-discharge action has established a prima facie case, the burden shifts to the employer to adduce substantial evidence of a legitimate reason for the discharge.
"An employer's stated basis for a discharge is sufficient as a matter of law when the underlying facts surrounding the stated basis for the discharge are undisputed and there is no substantial evidence indicating (a) that the stated basis has been applied in a discriminatory manner to employees who have filed workers' compensation claims, (b) that the stated basis conflicts with express company policy on grounds for discharge, or (c) that the employer has disavowed the stated reason or has otherwise acknowledged its pretextual status."
Aldridge, 854 So.2d at 568 (emphasis supplied).
In Aldridge, we concluded that the plaintiff had offered no evidence "indicating that termination otherwise conflicted with stated company policy on grounds for discharge." 854 So.2d at 569. As noted, that is not the situation here.
Video argues that, whatever might have been the actual facts of Ford's "call in" history and his history of reporting to work, Kulbitskas established by his affidavit that, when he wrote Ford on February 4, to the best of Kulbitskas's knowledge, neither he nor any other representative of Video had relieved Ford of the requirement *502 of telephoning Video daily to report in, and Ford had simply not telephoned in as required after January 25. In McCollum, 881 So.2d at 983, we explained:
"[Section] 25-5-11.1 demands that there be specific knowledge of the plaintiff's claim for benefits on the part of the one who terminated the plaintiff, and that that knowledge be the sole motivating force behind the termination. There is no room in the statute for a generalized `imputation' of such knowledge throughout a company or other entity; rather, in order to establish a prima facie case, the plaintiff must demonstrate, by substantial evidence, a direct and distinct causal link between one having knowledge of the plaintiff's workers' compensation claim and the termination."
Here the issue of knowledge is different; the question is not whether Kulbitskas knew that Ford had filed a workers' compensation claim, but whether he knew that Ford had been relieved of the duty of contacting Video to check on the availability of work. Although one might infer from the circumstances that when Kulbitskas learned of the telephone call placed by Ford's mother he also necessarily learned what Keith had told her, this possible inference is eliminated by an express concession in Ford's brief to this Court. In arguing that Keith occupied a confidential relationship with Kulbitskas, so that Keith's knowledge of his conversation with Ford's mother should be imputed to Kulbitskas, Ford states, "Keith, as advisor and counselor, should have informed Kulbitskas of his conversation with Ford's mother. However, he did not." (Ford's brief, p. 28.) (Emphasis added.) Such an explicit admission in a brief is binding on the party making it. Best Plant Food Prods., Inc. v. Cagle, 510 So.2d 229 (Ala. 1987); Louisville & N.R.R. v. Johns, 270 Ala. 694, 121 So.2d 872 (1960); and First Nat'l Bank v. Town of Luverne, 235 Ala. 606, 180 So. 283 (1938).
Nonetheless, as explained in Aldridge, an employer's stated basis for discharge is sufficient as a matter of law only when the underlying facts surrounding the stated basis for the discharge are undisputed and, among other things, there is no substantial evidence indicating that the stated basis conflicts with express company policy on grounds for discharge. In addition to the previously discussed company policy regarding the progression of disciplinary action when an employee failed to call in or to show up for work, Don Tyler testified that when an employee did not call in the first time, he was orally reminded of the policy and then written up only if he failed to call in again. Tyler testified that if an employee has not called in by 5:00 to check on the availability of work for the next day, "sometimes we  we try calling them. Other times we just reschedule and put somebody else in their place."
Chris Eady testified on deposition that if an employee failed to call in, nothing usually happened; that if the employee failed to report to work, the employee would sometimes be called, depending on the work; and that it would be fair to say that if Video needed an employee who had not telephoned in to check on the status of work, they would telephone him the next day to report to work.
Under Keith's understanding of company policy, not showing up for work would not automatically cause a person's employment to be terminated; he testified that "if [an employee's] got a reason, then you know, [he's] got a reason."
In explaining his reason for writing the letter of February 4 to Ford, Kulbitskas testified:
"His mother called in one day. And then we didn't hear from Terry, for, I don't know, a week or something like *503 that. You know particular interest was paid to Terry, because we were trying to accommodate him, get him into the TV end of it. We had other jobs going on, which he could have worked at, and he just did not call in.

". . . .
"Terry did not want to work. He didn't call in. We talked to him repeatedly about calling in. We tried to call him. And, basically, you know, when a guy doesn't call in and doesn't call in, and you try to get him to come in, he didn't appear to be interested in working."
(Emphasis added.) As noted, Ford's evidence contradicts Kulbitskas's assertion that Video had tried to telephone Ford. Also, contrary to Kulbitskas's representation that if Ford had called in after January 25, Video had jobs on which he could have worked, Keith testified that he, as Ford's supervisor, had run out of jobs to which he could assign Ford, and every day from January 16 to January 25 Keith had advised Ford that there was no work available.
Ford was written up for "disobedience" immediately after he had recovered sufficiently to return to work, and he was suspended for a day as a disciplinary measure. The write-up was unjustified, given that Ford had advised Don Tyler he would have to be off work that next day because of a doctor's appointment, and, at any event, a write-up, much less a suspension, was contrary to company policy in connection with an employee's first failure to call in. On only his second workday thereafter, December 14, 2001, Ford was again written up, without notice to him, this time for being uncooperative for allegedly refusing to perform assigned work.
Thus, there is substantial evidence in the record indicating that Video's stated basis for discharging Ford "conflicts with express company policy on grounds of discharge." Aldridge, 854 So.2d at 568.

D. Pretext
Much of what we have already discussed is relevant to the issue whether Video's stated reason for terminating Ford's employment  that he simply stopped calling in without justification after January 25, 2002  could be deemed to be pretextual. "If we were to say that, as a matter of law, the reason given by [the employer] is a conclusively legitimate reason, the beneficent purposes of section [25]-5-11.1 would be significantly undermined." Flint Constr. Co., 904 So.2d at 251 (quoting Culbreth v. Woodham Plumbing Co., 599 So.2d 1120, 1123 (Ala.1992)). Kulbitskas asserted that particular interest was paid to Ford, and that Video tried to telephone him after he had stopped calling in. This is contrary to the facts presented by Ford, and the failure to attempt any contact with Ford was contrary to company policy. He was wrongfully written up on three separate occasions, and, in connection with the December 11 write-up, he should have received an oral reminder rather than a written citation for disobedience placed in his personnel file. After Keith had run out of jobs to assign Ford to, beyond flagging traffic, and had thereafter advised Ford on seven successive occasions that there was no work for him, it was contrary to company policy  and to the special interest supposedly being paid to Ford  to terminate Ford's employment without at least once attempting to telephone him.
Despite the fact that Video's stated basis for terminating Ford's employment conflicts with express company policy regarding grounds for discharge, to the extent Kulbitskas's assertion that there was a legitimate basis shifts the burden to Ford to show that the stated reason was pretextual, the totality of the evidence is sufficient *504 to raise a genuine issue of material fact concerning whether Video's stated reason for terminating Ford's employment was pretextual.

II. Willful Removal of a Safety Device
Section 25-5-11, Ala.Code 1975, provides, in pertinent part:
"(b) If personal injury ... to any employee results from the willful conduct, as defined in subsection (c) herein, of any . . . employee of the same employer. . ., the employee shall have a cause of action against the person . . . .
"(c) As used herein, `willful conduct' means any of the following:
. . . .
"(2) The willful and intentional removal from a machine of a . . . safety device provided by the manufacturer of the machine with knowledge that injury or death would likely or probably result from the removal. . . ."
Ford has consistently labeled the violation of this statute as "intentional trespass." Whatever the proper designation, § 25-5-11(b) clearly envisions an action against only a co-employee. Thus, only Eady may be the subject of this claim.
This Court, in Harris v. Gill, 585 So.2d 831, 835 (Ala.1991), broke § 25-5-11(c)(2) into four elements:
"1. The safety guard or device must have been provided by the manufacturer of the machine;
"2. The safety guard or device must have been removed from the machine;
"3. The removal of the safety guard or device must have occurred with knowledge that injury would probably or likely result from that removal; and
"4. The removal of the safety guard or device must not have been part of a modification or an improvement that rendered the safety guard or device unnecessary or ineffective."
The failure to install a safety device is the equivalent of removing of that device. Bailey v. Hogg, 547 So.2d 498, 500 (Ala.1989). In the instant action, although Ford charges Eady with removal of the safety T, it seems clear that his allegation is actually that Eady never installed the safety T on the vacuum hose that caused Ford's injuries. This allegation, however, is functionally equivalent to the allegation of the removal of a safety device, as Hogg indicates.
In his motion for a summary judgment on this issue, Eady argued that the safety T was not "provided by the manufacturer of the machine" and thus that the failure to install the safety T could not constitute willful conduct under § 25-5-11(c)(2).
In Harris v. Simmons, 585 So.2d 906 (Ala.1991), we held that there was no evidence of willful conduct because the safety guard alleged not to have been installed was not provided by the manufacturer. 585 So.2d at 907. Three distinct portions of Kulbitskas's deposition testimony, presented in chronological order, are relevant to the issue whether the safety T was provided by the manufacturer:
"Q. [Counsel for Ford:] . . . [W]ho is the manufacturer of the particular vacuum on this jetter truck?
"A. On the truck that we  which one?
"Q. The manufacturer of the vacuum.
"A. That was on this job here?
"Q. Yeah.
"A. That was Clean Earth 
"Q. Clean Earth?
"A.  Manufacturing, here in Birmingham.
"Q. Located here in Birmingham?
"A. Uh-huh. (Witness indicates affirmatively.)

*505 "Q. Do they build them here in Birmingham?
"A. They build them.
"Q. Oh, really?
"A. They assemble them, yeah.
"Q. Do you have a rep that comes out to visit you, or do you just do direct 
"A. No. We've done business with them quite a while, and they're just pretty much  it's a corporate account."
Shortly thereafter, the following discussion transpired. Here, Kulbitskas is testifying regarding the hoses connected to the vacuum and used to vacuum material out of the water-treatment tanks:
"Q. Now, do you purchase those hoses? And would you purchase those at Home Depot [a building-supplies store], or wherever else 
"A. No, we get them from the  direct from the manufacturer.
"Q. Oh, okay, from the manufacturer of the 
"A. Of the plastic hose.
"Q. Okay. And that would be Clean Earth Manufacturing?
"A. No.
"Q. No. Okay.
"A. I'm trying to think of who sells that hose. I don't know."
Finally, counsel for Ford moved from a discussion of the vacuum and the hoses to the actual safety T:
"Q. . . . Could you explain to me what that safety T is for.
"A. That's if  if there's a problem of the hose getting stuck  something stuck, you know, to the floor, and you can't get it loose. You ... stuck it into the material too far, and you can't get it out of it, you break the vacuum by allowing air to get into the hose and back to the truck 
"Q. Okay.
"A.  at some point along the line.
"Q. Okay. So that would be something that was in the hose, or would it be something in the  or the truck, or the back 
"A. It's on the hose.
"Q. On the hose?
"A. On the hose.
"Q. Okay. And is that something that you would purchase separately from the manufacturer or 
"A. Yes. There are people that sell that particular item.
"Q. Okay. Who are the people that sell that particular item?
"A. I can't think of the name of the company, but it's a safety equipment company that sells that type of stuff.
"Q. Okay. Now you  obviously, you purchased those, you know  is it called a safety switch?
"A. Safety T.
"Q. Safety T. And you purchased those direct from the company 
"A. The company, yeah.
"Q.  who manufactures the thing? And would it be  would you have purchase orders on those?
"A. It would be either that or bills, or something like that.
"Q. Okay. How often do those need to be replaced?
"A. That's hard to say. We will buy a number of them.
"Q. Uh-huh. (Counsel indicates affirmatively.)
"A. Let's say a dozen, just for a number 
"Q. Right.
"A.  and have them in stock. And they have a way of being used as wheel chalks and getting lost and strayed and *506 stolen. And so then we'll  as they get up to the point where we don't have enough for the trucks in spare, then we'll order another batch."
These three segments of Kulbitskas's deposition testimony establish that Clean Earth Manufacturing was not the supplier of the safety T Video used on the vacuum hoses it used to perform its cleaning services. Kulbitskas's testimony demonstrates that he is quite familiar with Clean Earth Manufacturing and its products, that he is sure that Video does not purchase its hoses from Clean Earth Manufacturing, and that it purchases them from another company. He could not recall the name of that company. He likewise knows that Video obtains the safety T's it uses from "a safety equipment company," not Clean Earth Manufacturing, although, again, he could not recall the name of that company. Clearly, if Clean Earth Manufacturing was the supplier of the safety T, Kulbitskas would recall this fact. Therefore, we conclude that Eady has made a prima facie showing that Clean Earth Manufacturing, the manufacturer of the vacuum involved in the incident in which Ford was injured, did not "provide" the safety T at issue.
In response to this showing, Ford points first to a "Parts and Accessories Catalog" put out by the "Clean Earth Environmental Group." On page one of that catalogue is a "Disclaimer" that provides, in pertinent part, that "Clean Earth Environmental Group, Inc. does not manufacture or purport to own the product names and designs noted herein with a `,' but Clean Earth is proud to offer these quality products to its customers...." On page 13 of the catalogue, a variety of sizes of "In-Line Relief Valves" is advertised. A safety T is, as noted, also known as an in-line relief valve. There is no "" designation associated with the advertisement for this item; therefore, it is reasonable to conclude that Clean Earth Environmental Group, Inc., is the manufacturer of the safety T advertised in its catalogue.
The catalogue issued by Clean Earth Environmental Group, Inc., although advertising several of its vacuum trucks in its final pages, does not advertise the SV-119 model vacuum truck as an item available for purchase or rental from that vendor. There is thus no indication that Clean Earth Environmental Group, Inc., is related to Clean Earth Manufacturing. In addition Kulbitskas was clear in his testimony that Video obtains safety T's not from Clean Earth Manufacturing, but from another source. Whether that safety T was purchased from Clean Earth Environmental Group, Inc., or some other third party not pertinent to this appeal, there remains a complete dearth of evidence indicating that when Video purchased the SV-119 vacuum any hose that came with it was equipped with a safety T. Because Ford's burden is to present substantial evidence creating a genuine issue as to who manufactured the safety T at issue, and because the evidence proffered by Eady makes a prima facie showing that someone other than Clean Earth Manufacturing provided the safety T at issue, we conclude that Eady is entitled to a summary judgment as to this issue.

Conclusion
Because the defendants have met their burden of demonstrating that there is no genuine issue of material fact as to Ford's "trespass" claim, and because the defendants are consequently entitled to a judgment as a matter of law on this issue, we affirm the trial court's summary judgment as to that claim. We likewise affirm the summary judgment for Carylon and Eady on Ford's retaliatory-discharge claim. Because Video has not met its burden with respect to Ford's retaliatory-discharge *507 claim, we reverse the summary judgment for Video as to that claim and remand the cause for proceedings consistent with this opinion.
APPLICATION OVERRULED; OPINION OF NOVEMBER 10, 2005, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
NABERS, C.J., and SEE, LYONS, WOODALL, STUART, SMITH, and BOLIN, JJ., concur.
PARKER, J., concurs specially.
PARKER, Justice (concurring specially).
I concur with the main opinion solely because it correctly interprets § 25-5-11, Ala.Code 1975, thereby precluding recovery by Terry Ford for the injuries he suffered. I am writing specially because I believe that in this case the statute does not adequately fulfill its intended purpose of providing a cause of action for injury or death resulting from the willful conduct of a third party, and I call upon the Alabama Legislature to correct the wording of the statute so that equity may be served in future claims of this nature.
Section 25-5-11, Ala.Code 1975, provides a cause of action for an employee or the employee's estate to recover damages from a third party for personal injury or death that "results from the willful conduct, as defined in subsection (c) herein, of any ... employee of the same employer...." § 25-5-11(b), Ala.Code 1975. "[T]he willful and intentional failure to install an available safety guard equates to the willful and intentional removal of a safety guard for the purposes of Ala.Code 1975, § 25-5-11(c)(2)." Bailey v. Hogg, 547 So.2d 498, 500 (Ala.1989).
Terry Ford was injured on the job that he had held for about two weeks when he lost control of a large vacuum hose and his arm was drawn into it. An experienced coworker had set the machine up without using a "safety T," which some evidence indicates might have prevented, or substantially reduced the severity of, Ford's injuries. Testimony was presented indicating that Ford's employer kept a stock of the safety T's on hand, and the evidence established that the company required the use of the safety T for every job involving a vacuum.
Ford's injuries required surgery and physical therapy. He also received psychological treatment and did not return to work for nearly nine months after the accident. Although it would seem that Ford could have a cause of action under subsection (c) as defined above and in Hogg, that is not to be, as evidenced by the main opinion, because an action for recovery for damages is precluded by subsection (c)(2), which provides an action for the "willful and intentional removal from a machine of a . . . safety device provided by the manufacturer of the machine . . . ." (Emphasis added.) In short, merely because the uninstalled safety T was not provided by the manufacturer of the vacuum machine, Terry Ford cannot recover for his injuries.
I believe Terry Ford has suffered an injustice. Unfortunately, the statute as currently worded does not afford him a remedy. As tempting as it might be to expand the statute beyond its plain meaning and to afford him the remedy he rightfully deserves, by doing so we as judges would be usurping a role that does not belong to us. Judge Robert Bork wrote of just such a judicial temptation to engage in political activism:
"In law, the moment of temptation is the moment of choice, when a judge realizes that in the case before him his strongly held view of justice, his political and moral imperative, is not embodied in a statute or in any provision of the Constitution. *508 He must then choose between his version of justice and abiding by the American form of government. Yet the desire to do justice, whose nature seems to him obvious, is compelling, while the concept of constitutional process is abstract, rather arid, and the abstinence it counsels unsatisfying. To give in to temptation, this one time, solves an urgent human problem, and a faint crack appears in the American foundation. A judge has begun to rule where a legislator should."
Robert Bork, The Tempting of America: The Political Seduction of the Law 1 (McMillan, Inc., 1990). As Judge Bork warned, judges are to apply, not make, law. If we were to expand the statute in this case to produce the result we would like to see, we would usurp a power the Framers of our constitutional system wisely reserved to the legislative branch of government. In fact, we are at the outer parameter of our authority when we interpret and apply the law as enacted by the legislature, call an unfortunate result to the attention of the legislature, and urge it to take corrective action.
NOTES
[1] One of Video's functions is televising sewers for municipalities and private developers, looking for abnormalities in the pipes. Apparently, this is the "TV work" to which Tyler is referring.